THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SYLVESTER HENDERSON, Defendant-Appellant.

First District (4th Division)   Nos. 1—99—1277, 1—99—3220 cons.

Opinion filed June 27, 2003.—Rehearing denied September 19, 2003.—Modified opinion filed September 25, 2003.

Michael J. Pelletier and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Alan Spellberg, and Joan F. Frazier, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Following the denial by the trial court of defense counsel's motion to compel deoxyribonucleic acid (DNA) testing pursuant to the Code of Criminal Procedure of 1963 (725 ILCS 5/116—3 (West 1998)) and the trial court's dismissal, following an evidentiary hearing, of Sylvester Henderson's petition for postconviction relief, two appeals were filed. These appeals were consolidated. For the reasons that follow, we affirm dismissal of the defendant's postconviction petition and we reverse the denial of defendant's motion to compel DNA testing.

Defendant and codefendant James Sims were convicted in 1984 for offenses arising from the kidnap and rape of 26-year-old K.R. in Chicago. Both men were convicted, adjudicated as habitual offenders, and sentenced to natural life in prison.

Defendant's conviction was affirmed on direct appeal in 1987. *People v. Sims*, 166 Ill. App. 3d 289 (1987). His petition for leave to appeal to the Illinois Supreme Court was denied. *People v. Henderson*, 119 Ill. 2d 565 (1988). Defendant's petition for writ of *certiorari* to the United States Supreme Court was denied (*Sims v. Illinois*, 488 U.S. 844, 102 L. Ed. 2d 97, 109 S. Ct. 118 (1988)), as was his petition for writ of *habeas corpus* (*United States ex rel. Henderson v. Gramley*, 93 C 4202 (N.D. Ill. April 7 1994)).

In 1990, defendant filed a postconviction petition, which was denied. That denial was affirmed on appeal. *People v. Henderson*, No. 1—90—3199 (1992) (unpublished order pursuant to Supreme Court Rule 23).

Defendant filed a motion to compel DNA testing (725 ILCS 5/116—3 (West 1998)) in 1998, which was denied on February 9, 1999.

Defendant subsequently filed a second postconviction petition in 1999, asserting his life sentence was unconstitutional under *Apprendi v. New Jersey*, 539 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). This petition was denied on August 18, 1999.

Defendant now appeals from the denial of his request for DNA testing and the summary dismissal of his successive postconviction petition based on *Apprendi*.

## BACKGROUND

Defendant and Sims were lifelong friends. In 1971, they were involved in a rape and robbery and were convicted for rape, aggravated kidnaping and robbery. *People v. Henderson*, 36 Ill. App. 3d 355 (1976). James Sims had only been paroled from prison six weeks prior to committing this offense.

The sequence of events began at 9 p.m. on September 21, 1983, when K.R. left her North Side apartment. K.R. testified to the following: As she approached an alley, James Sims stepped out and walked past her. A second later, Sims grabbed K.R. by the neck and put a knife to her throat. He started going through her pockets.

K.R. screamed, and Sims said, "Shut up, or I'll slit your throat." Sims knocked K.R. to the ground and repeatedly struck her face against the pavement, fracturing her left cheekbone. Sims dragged K.R. into the alley, where the 36-year-old defendant sat waiting in a maroon car. There were lights in the alley and streetlights and light from surrounding buildings. K.R. later described defendant to police as 5 feet 10 inches tall, 160 pounds, with a goatee and mustache, and dressed in a blue windbreaker and faded blue jeans with two small bloodstains between the knee and hip.

Defendant and Sims forced K.R. into the car. Sims pushed her down at knifepoint, so that her head and left hand were forced onto defendant's right leg. One of K.R.'s left-hand fingers was bleeding from her struggle with Sims, and it bled onto defendant's right thigh. When defendant noticed the blood on his pants, he gave K.R. a pink towel and told her to wipe it off. Defendant then placed the towel over K.R.'s head.

Defendant and Sims stopped at a liquor store. K.R. begged defendant to take her home, promising she wouldn't say anything. Defendant replied, "I can promise you won't be hurt, but that doesn't mean you won't be fucked."

After Sims returned with liquor, the men pulled over and forced K.R. into the backseat of the car with Sims. The ceiling light in the car illuminated when the car door was opened. The pink towel had fallen off K.R.'s face and was not replaced. K.R. asked Sims not to hurt her; he responded that she would be lucky if she saw the next day. Sims ripped off her pants and told her to remove the rest of her clothing. He licked her vagina and forced her to commit an oral sex act.

Defendant and Sims then changed places in the car. Defendant licked K.R.'s vagina, forced her to commit oral sex, and then raped her vaginally and attempted to commit anal rape. Defendant was in the backseat with K.R. for at least an hour.

Sims and defendant then changed places. Sims licked K.R.'s vagina and committed an act of vaginal rape. Defendant and Sims asked K.R. where she lived and started driving back to the North Side. They threw her clothing at her and told her to get dressed. K.R. put on her sweatpants and sweatshirt, but not her underwear.

Defendant and Sims then drove into an apartment building parking lot located at 4500 North Clarendon Street. K.R. was still in the backseat of the car. Both defendant and Sims got out of the car, and K.R. heard some mumbling. Then Sims returned to the backseat of the car, pulled his pants down, and got on top of K.R. Sims told K.R. that if she was ever attacked again, she should not scream because it only made things worse.

In the meantime, a security guard working at the apartment building reported to police that he saw a suspicious car in the building's garage. Police patrolling the area were only a few blocks away and responded quickly. As the officers entered the garage, they saw a black male, dressed in dark clothing, hop a wall in the garage and flee down an alley. While one of the officers pursued the man who fled, another approached a Buick that had been parked crosswise in a parking spot and was blocking two vehicles. The officer looked in the Buick and saw Sims lying on top of K.R., with his pants pulled down around his ankles.

A policeman pulled Sims out of the car, and someone else told K.R. to get out. K.R. grabbed an officer's arm and said, "Please don't let them hurt me anymore." The police saw that K.R. had been beaten; her eyes were closed, she bore cuts and bruises on her face, and her hands needed stitches. Asked what had happened, K.R. said she had been raped. Police placed Sims under arrest.

Among the items police found in the car was a navy blue shirt lying on the front seat, with two driver's licenses tucked inside a pocket. One license belonged to defendant and the other to Sims. In the photo on defendant's license, he wore a mustache and goatee, and his height, weight, and age were close to the description given by K.R. Police also found a razor knife and a knife blade in the backseat. Police ran a computer check and learned that the car was registered to defendant.

Having learned defendant's identity, police issued a flash message that defendant may have been the second offender in the case. Shortly thereafter, at 2 a.m., Chicago police officer David DeVogelear saw a man dressed in blue jeans and a blue nylon jacket sitting at a bus stop at the intersection of Sheridan, Montrose, and Broadway, a few blocks from the parking garage. Officer DeVogelear asked defendant what he was doing, and defendant replied that he had been visiting friends and was waiting for the bus, to take him to his home at 6400 South Ken-

wood. The address listed on defendant's driver's license was 6618 South Kenwood in Chicago. Officer DeVogelear asked him for identification, and defendant reached back as if to retrieve his wallet. At that moment, however, the police were called away to respond to a woman screaming for help. They left immediately.

K.R. was taken to Weiss Hospital that night, and a Vitullo kit was prepared. After being examined by a plastic surgeon the next day, she was admitted to Northwestern Hospital, where she remained for several days.

Detective Fred Stone and other police searched for defendant at several Chicago addresses. Not finding him, they went to his Park Forest address at about 11 a.m., some nine hours after defendant talked to Officer DeVogelear. Defendant was still in bed. He matched K.R.'s description except that, as he admitted to police, he had just shaved off his goatee. One of defendant's coworkers testified at trial that defendant wore a goatee on the day of K.R.'s assault and said that, in the four months she had worked with him, he always wore a goatee.

Police arrested defendant, recovering from his bedside floor a pair of jeans with bloodstains on the thigh. The jeans were sent to the Chicago crime lab for forensic analysis.

That night, Officer DeVogelear happened to be at Area 6 when he noticed defendant sitting in an interviewing room. He remembered defendant from the night before and noticed that he no longer had a goatee. Officer DeVogelear asked Detective Stone why defendant was there, and Stone said defendant had been identified as the second offender in a rape that had occurred the night before. Officer DeVogelear said that he had seen defendant the night before, sitting at a southbound bus stop just a few blocks from 4500 North Clarendon.

On September 23, police detectives showed K.R. a photo array, including a Polaroid of defendant that police had just taken. K.R. identified defendant as one of the men who had assaulted her and told police that defendant's chin looked different in the photo because he was not wearing the goatee he had when she was raped. K.R. also identified items police had recovered from defendant's car, including the bloody pink towel, a pair of men's underwear, the knife Sims used against her, and her eyeglasses and underwear.

At trial, Chicago police officer Michael Zefeldt, a microanalyst for the Chicago crime lab, testified as an expert witness to the results of his testing of the contents of the Vitullo kit. Officer Zefeldt testified that defendant's blue jeans tested positive for the presence of blood on the mid-right leg portion of the garment. The bloodstain found on the blue jeans was consistent with blood type AB. K.R.'s American Red Cross blood donor card reflects that her blood type is AB. Only 3% of

the population has type AB blood. The bloodstains found on K.R.'s sweatshirt were consistent with her AB blood type. K.R.'s vaginal smear tested positive for the presence of spermatozoa. K.R.'s sweatpants tested positive for the presence of spermatozoa and blood. The testing on K.R.'s oral swab was negative, but Zefeldt's testing of 500 oral smears and swabs had yielded positive results in only two cases. Zefledt testified that he did not test the blood of either the victim or the defendants. No semen typing was conducted on any of the evidence.

Defendant presented an alibi defense. He said he ran into Sims outside work on September 21, 1983, as Sims was experiencing some car trouble. Sims followed defendant home, and defendant loaned him his car. After Sims left between 7:30 p.m. and 8 p.m., defendant said, he did not leave the house again that night. Defendant's wife and son supported his alibi. Defendant admitted that he shaved off his goatee between 9 p.m. and midnight that night. However, defendant denied that the pants police recovered from his house were his or were found by police in his house. Defendant further denied telling the police that the bloodstains on his pants were from an incident several days earlier when he cut his finger while working on his car.

James Sims testified in his own trial and for the defendant's jury that he never raped K.R. or had sexual relations with her. Sims testified that he saw K.R. on the street on the night of the assault and asked her to go drinking with him. After they drank and smoked marijuana, Sims said, he asked K.R. if she wanted to have sex with him. She did not answer yes or no, but said she wanted to go home because it was late. Sims said he pulled into the apartment building parking lot because he wanted to convince K.R. to have sex with him. He had just started kissing K.R. in the backseat of the car when the police appeared.

Sims denied that he was on top of K.R. with his pants down when the police spotted him. Sims claimed at trial that K.R.'s face was not bruised while she was with him and said there was no bloody pink towel in the backseat of the car. Sims had no explanation for the presence of K.R.'s underwear in the backseat of the car. Sims also said there was never another man with them in the car.

Regarding defendant, Sims testified that he followed him home on September 21 so defendant could work on his car. Sims borrowed defendant's car and left.

Defense witness Antoinette Morgan, who worked with defendant, testified that when the two left work that day, they ran into James Sims. Sims talked to defendant about committing a "stickup" because Sims needed some money. Ms. Morgan said she thought defendant was wearing a goatee that day.

Officer Schmitt testified in rebuttal that defendant had told him that the blood on his pants came from a cut on his finger.

The jury found defendant guilty of rape and deviate sexual assault. Based on defendant's criminal record, the court adjudicated him an habitual offender and sentenced him to natural life in prison. Sims was found guilty of rape, but not guilty of deviate sexual assault. He was also sentenced to natural life as an habitual offender.

## ANALYSIS
### *APPRENDI* CLAIM

■ We first address defendant's contention that his natural life sentence as an habitual offender violates the holding in *Apprendi v. New Jersey*. The Habitual Criminal Act (720 ILCS 5/33B—1 *et seq.* (West 1998)) does not violate *Apprendi*. *People v. Jones*, 328 Ill. App. 3d 233 (2002); *People v. Allen*, 335 Ill. App. 3d 773 (2002). Further, in *People v. De La Paz*, 204 Ill. 2d 426 (2003), our supreme court held *Apprendi* does not apply retroactively. *People v. De La Paz*, 204 Ill. 2d at 439. As this issue is before us on a successive postconviction petition, defendant's argument is without merit.

### MOTION FOR FORENSIC TESTING

■ Section 116—3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116—3 (West 1998)) became effective January 1, 1998. Its purpose is to provide an avenue for convicted defendants who maintained their innocence to test available genetic material capable of providing new and dramatic evidence materially relevant to the question of the defendant's actual innocence. *People v. Urioste*, 316 Ill. App. 3d 307 (2000). Section 116—3 provides:

"§ 116—3. Motion for fingerprint or forensic testing not available at trial regarding actual innocence.

(a) A defendant may make a motion before the trial court that entered the judgment of conviction in his or her case for the performance of fingerprint or forensic DNA testing on evidence that was secured in relation to the trial which resulted in his or her conviction, but which was not subject to the testing which is now requested because the technology for the testing was not available at the time of trial. Reasonable notice of the motion shall be served upon the State.

(b) The defendant must present a *prima facie* case that:

(1) identity was the issue in the trial which resulted in his or her conviction; and

(2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect.

(c) The trial court shall allow the testing under reasonable conditions designed to protect the State's interests in the integrity of the evidence and the testing process upon a determination that:

(1) the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence;

(2) the testing requested employs a scientific method generally accepted within the relevant scientific community." 725 ILCS 5/116—3 (West 1998).

A trial court's ruling on a motion brought pursuant to section 116—3 is reviewed *de novo. People v. Hockenberry*, 316 Ill. App. 3d 752, 755 (2000). Our review is *de novo* because the trial court's decision regarding such a motion is not based upon its assessment of the credibility of the witnesses but on its review of the pleadings and the trial transcripts. *Hockenberry*, 316 Ill. App. 3d at 755; *People v. Jones*, 334 Ill. App. 3d 61, 63 (2002).

As to section 116—3(a)'s requirement that the technology for the testing now requested was not available at the time of trial, we note that the defendant was convicted in 1984. In *People v. Daniels*, 301 Ill. App. 3d 87 (1998), we reviewed a case in which DNA testing was performed in 1988. We pointed out "[t]his is one of the first, if not the first, criminal cases in Illinois where a trial judge allowed the State to present DNA evidence against the accused." *Daniels*, 301 Ill. App. 3d at 88. Also, "[w]hile this case may have been early in the history of forensic DNA testimony, it was not unique in Illinois. Cases concerning a similar time frame upheld the use of DNA identification evidence. See *People v. Miles*, 217 Ill. App. 3d 393, 577 N.E.2d 477 (1991); *People v. Lipscomb*, 215 Ill. App. 3d 413, 574 N.E.2d 1345 (1991)." *Daniels*, 301 Ill. App. 3d at 102. The availability of DNA testing became widely known in Illinois in 1988 when the Prisoner Review Board was presented evidence based on DNA testing when the Board reviewed the clemency request of Gary Dotson. See G. O'Reilly, *A Second Chance for Justice: Illinois' Post-Trial Forensic Testing Law*, 81 Judicature 114 (Nov./Dec. 1997).

While the DNA testing requested by defendant has been available for some 15 years, section 116—3 does not contain any language indicating a legislative intent to impose a time limit for filing a motion for forensic testing. *People v. Barksdale*, 327 Ill. App. 3d 422, 430 (2001); *People v. Rokita*, 316 Ill. App. 3d 292, 303 (2000). In the instant case, DNA testing was not available at the time of trial. Consequently, defendant has met this requirement. Defendant has also met section 116—3(b)(1)'s requirement that a petition must present a *prima facie* case that identity was the issue in the trial that resulted in his conviction.

The State argues that the defendant has not met section 116—3(b)(2)'s requirement that the defendant must present a *prima facie* case that the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced or altered in any material aspect. The defendant replies that the record reflects that the trial court entered an order allowing one of the defendant's counsel to inspect the evidence that was impounded by the office of the clerk of the circuit court.

In *People v. Johnson*, 205 Ill. 2d 381 (2002), our supreme court considered the record from the trial court, in which the State had told the trial court that DNA testing did not exist in 1984 and the assistant State's Attorney had no objection to the State doing the testing. The supreme court held that this action waived the State's argument on appeal that the defendant had failed to make a *prima facie* case for DNA testing because he had not shown the Vitullo kit had been subject to a proper chain of custody. The court further held that, even if the State did not waive the issue, the fact that the Vitullo kit was admitted into evidence meant that the clerk of the circuit court would have retained custody of the kit after the trial and therefore the Vitullo kit was subject to a sufficiently secure chain of custody for the purposes of section 116—3(b)(2). *Johnson*, 205 Ill. 2d at 392-93.

Pursuant to the holding in *Johnson*, the defendant has established a sufficient chain of custody in the instant case. Clearly, it is preferable that the parties address this requirement in the trial court. If the State wishes to object to the section 116—3 request based on insufficient evidence relating to the chain of custody, it should raise that matter in the trial court. Similarly, if the defendant asserts that he is unable to plead and prove the proper chain of custody because the evidence at issue has been in the safekeeping of the State or the clerk of the circuit court, the trial court may allow limited discovery in the appropriate case. *People v. Travis*, 329 Ill. App. 3d 280, 283 (2002).

The People strenuously argue that the trial court was correct in holding that the testing requested did not have the "scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence" as required by section 116—3(c)(1). They base their argument on the strength of the case against the defendant, which they describe as overwhelming. The State asserts that the incontrovertible facts show that: (1) the victim was kidnaped by Sims and placed into the defendant's car; (2) the victim was able to view both Sims and defendant for several hours; (3) the police caught Sims engaged in sexually assaulting the victim; (4) a second black male was seen fleeing the scene; (5) the defendant was

seen a few blocks from the parking garage and interviewed by Officer DeVogelear within minutes of the police arresting Sims in the act of sexually assaulting the victim; (6) the police recovered defendant's driver's license in his car where the sexual assaults took place; (7) the defendant admitted shaving off his goatee the night of the attack; (8) a defense witness said that defendant and Sims were together the night of the attack and Sims was talking about robbing people; (9) defendant told the police that the bloodstains on his pants were the result of a cut he suffered several days earlier, but at trial, defendant testified that the pants introduced into evidence at trial were not his and the police did not recover them from his house; and (10) the defendant and Sims previously had been convicted of kidnaping a woman off the street and raping her. While we agree that the evidence against the defendant was indeed overwhelming, we believe that our supreme court's holdings interpreting section 116—3 requests require us to hold that the trial court erred in not ordering forensic testing in this case.

In *People v. Savory*, 197 Ill. 2d 203 (2001), our supreme court disagreed with the appellate court's holding (*People v. Savory*, 309 Ill. App. 3d 408 (1999)) that the remedy provided by section 116—3 is available only in cases where the proposed scientific testing will, by itself, completely vindicate a defendant. The court held, "evidence which is 'materially relevant' to a defendant's claim of actual innocence is simply evidence which tends to significantly advance that claim." *Savory*, 197 Ill. 2d at 213. In deciding whether the evidence at issue in the motion for forensic testing is "materially relevant to the defendant's assertion of actual innocence," courts must consider the evidence introduced at trial and also assess the evidence the defendant is seeking to test. *Savory*, 197 Ill. 2d at 214.

In *Savory*, the supreme court found that the evidence that the defendant's pants had bloodstains that were consistent with one of the victims' blood type was "essentially a collateral issue at trial and was not central to the State's evidence of guilt." *Savory*, 197 Ill. 2d at 215. The court commented that the defendant's inculpatory statements made to friends within hours of the murder, and the fact the defendant told the police facts regarding the crime scene that only the offender could have known, were stronger evidence of the defendant's guilt than the bloodstained pants. Consequently, the supreme court affirmed the denial of the defendant's motion for DNA testing.

In *People v. Johnson*, 205 Ill. 2d 381 (2002), the supreme court addressed its holding in *Savory*. The court said, "unlike the defendant in *Savory*, the defendant here never made damning admissions placing himself at the crime scene. The State presented a strong, but largely

circumstantial, case; the only direct evidence of the defendant's guilt came from Payne's identification. A favorable result on a DNA test of the Vitullo kit would significantly advance the defendant's claim that he did not rape Payne, which, in turn, would significantly advance his claim that he did not murder Hackett." *Johnson*, 205 Ill. 2d at 396-97. The supreme court reversed the trial court's denial of defendant's section 116—3 motion to test genetic material in the Vitullo kit.

The State argues on appeal, as it did in the trial court, that the facts that there were multiple offenders involved in this case and that the defendant was tried on both a direct culpability and an accountability theory are both factors which support the trial court's denial of defendant's request for DNA testing. In support of its argument, the State relies heavily on this court's decision in *People v. Gholston*, 297 Ill. App. 3d 415 (1998). In affirming the trial court's denial of the defendant's section 116—3 motion for forensic testing, this court held: "[I]n this case, a negative DNA match would not exculpate defendant Gholston due to the multiple defendants involved, the lack of evidence regarding ejaculation by the defendant Gholston and defendant's own admission of guilt under a theory of accountability." *Gholston*, 297 Ill. App. 3d at 422. Defendant urges us to disregard *Gholston* because the court in *Gholston* applied the wrong standard in holding that section 116—3 motions should only be granted when the evidence to be tested has the potential to conclusively show the actual innocence of the defendant. *Gholston* was decided before *People v. Savory*, 197 Ill. 2d 203 (2001), settled this issue.

In *People v. Travis*, 329 Ill. App. 3d 280, 285 (2002), we held that a court of review may apply the *Savory* test to a given set of facts even though the trial court employed an erroneous standard. Applying the standard from *Savory* to the facts in *Gholston* would not change the holding in *Gholston*. The facts that the defendant's confession made him accountable for the actions of his codefendants and there were multiple offenders involved in the sexual assault supported a holding that a test result favorable to the defendant would not significantly advance his claim of actual innocence.

Similarly, in *Mebane v. State*, 21 Kan. App. 2d 533, 902 P.2d 494 (1995), the appellate court in Kansas considered a convicted rapist's postconviction request that DNA testing be performed on a rape kit. The incident occurred in 1985 and involved four offenders who had repeatedly raped the victim. In reviewing the denial of the postconviction relief, the appellate court characterized the examination of the rape kit as follows: "Because there was more than one possible donor, testing of the seminal fluid did not exonerate any of the suspects." *Mebane*, 21 Kan. App. 2d at 535, 902 P.2d at 495. The appellate court

reviewed several out-of-state cases that allowed postconviction DNA testing and then pointed out "each case involved a single perpetrator ***. *** This case involves multiple semen donors. Consequently, the results of DNA testing would probably be inconclusive, and it is highly unlikely that a positive determination of defendant's guilt or innocence could be made from the results of such test." *Mebane*, 21 Kan. App. 2d at 538-39, 902 P.2d at 497.

While it may be much more difficult to successfully analyze "mixed samples" (those containing genetic material from more than one person) (see C. Strom, *Genetic Justice: A Lawyer's Guide to the Science of DNA Testing*, 87 Ill. B.J. 18, 20 (1999)), it is not impossible. In deciding whether to order DNA testing in cases involving multiple offenders and accountability, trial courts should keep in mind that these factors were present in two of the most widely known cases in which DNA testing produced evidence which freed erroneously convicted individuals—the "Ford Heights Four" and the persons initially charged with the murder of Laura Roscetti. See E. Connors, *Convicted by Juries, Exonerated by Science*, U.S. Department of Justice (1996) (for case studies involving the use of DNA evidence to establish innocence after trial).

In the instant case, the defendant did not give a statement that would make him accountable for the actions of his codefendant Sims. Further, any concern about "mixed samples" certainly does not apply to the bloodstains on the defendant's pants. The State introduced evidence at trial that these stains were the result of the victim's cut hand bleeding on defendant's pants. Whether the stains were caused by the victim appears to be a question that is easily solved with today's technology.

We hold that the result of testing the bloodstains on the pants recovered in the defendant's bedroom "has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence." 725 ILCS 5/116—3(c)(1) (West 2000). If the requested test shows that the DNA in the bloodstains was not consistent with the victim's DNA, this fact would tend to "significantly advance" defendant's claim of actual innocence. See *Savory*, 197 Ill. 2d at 215; *Johnson*, 205 Ill. 2d at 396.

We note that if the scientific test performed on the bloodstains results in a finding that the DNA in the bloodstain matches the victim's DNA, this evidence would not support any request for relief under the Post-Conviction Hearing Act (725 ILCS 5/122—1 *et seq.* (West 2000)). See *People v. Peeples*, 205 Ill. 2d 480 (2002). We also note that if the scientific test performed on the pants results in a finding that some of the defendant's genetic material is present on the pants,

this would directly refute his trial testimony that the pants were not his. If, however, there is no "match," this fact may provide the basis for the defendant to file another postconviction petition asserting a claim of actual innocence.

In a petition for rehearing filed after issuance of the opinion in this case, the defendant for the first time asserted that the Vitullo kit which was admitted into evidence in this case contained swabs that tested positive for spermatozoa. In his petition for rehearing, defendant requested that we amend our opinion and order in this case to include an instruction to the trial court to order DNA testing of the swabs contained in the Vitullo kit. The defendant argues that if the DNA testing of the swabs does not reveal the presence of the defendant's DNA, this fact would tend to significantly advance the defendant's claim of actual innocence. We grant the defendant's request and instruct the trial court to order that DNA testing be performed on the swabs as well as on the bloodstains on the pants.

A claim of actual innocence based on newly discovered evidence may be raised in a postconviction petition. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). In order to support a claim of actual innocence, the defendant must submit new, noncumulative evidence material to the claim that could not have been obtained through due diligence at the time of trial. *People v. Harris*, 206 Ill. 2d 293, 301 (2002). This evidence of actual innocence has to be "so conclusive that it would probably change the result on retrial." *Johnson*, 205 Ill. 2d at 392. This is the standard to be employed by a trial court when considering whether to grant postconviction relief based on a "non-match" between a defendant-petitioner and the blood evidence that was secured in relation to the defendant's trial. We note that, as any new postconviction petition filed by defendant would be his third, the defendant will also have to meet the "cause and prejudice" test as explained in *People v. Pitsonbarger*, 205 Ill. 2d 444, 459-60 (2002).

In denying the defendant's motion for DNA testing, the trial court in the instant case essentially held that, assuming that the requested testing resulted in a non-match between the DNA in the bloodstains on the defendant's pants and the victim's DNA, this result would not be materially relevant to the defendant's assertion of actual innocence. We believe that the holdings of our supreme court in *Savory* and *Johnson* demonstrate that the supreme court perceives the aforementioned analysis as a shortcut that "collapses" the required steps in the inquiry. The court has expressed similar concerns when addressing the manner in which trial courts address *Batson* issues. See, *e.g.*, *People v. Jackson*, 145 Ill. 2d 43, 98 (1991) (cautioning trial courts "against collapsing what ought to be a methodical *Batson* hearing procedure into an undifferentiated review of defense and State contentions").

The factors that trial courts often rely on in denying section 116—3 motions are really more appropriately addressed in postconviction proceedings when the results of the testing may be considered. Some of these factors are extremely important but are rarely addressed in case law. The most important of these little-discussed factors is: What is the legal significance of a "non-match"?

This issue was addressed in an excellent law review article addressing postconviction DNA testing, K. Christian, *And The DNA Shall Set You Free: Issues Surrounding Postconviction DNA Evidence and the Pursuit of Innocence*, 62 Ohio St. L.J. 1195 (2001).

"The view that DNA evidence is less than conclusive and cannot prove innocence is one side of the debate. *** This belief is echoed by some law enforcement officials as well as by others who claim that it is untrue that a non-match between a suspect or defendant's DNA and the DNA found on the victim means that the suspect is innocent. Several reasons are offered to explain how a suspect can still be guilty when his or her DNA does not match DNA found on a victim or at a crime scene, including the use of condoms, the existence of multiple assailants, and the failure to ejaculate in sexual assault cases. Those who argue that a non-match between a suspect's DNA and crime scene DNA does not prove innocence explain that while a match between crime scene DNA sample and a suspect's DNA is conclusive, the converse—that a non-match between suspect and crime scene DNA points to a suspect's innocence—is not true. The conclusiveness and dispositive nature of DNA evidence directly corresponds to the circumstances of the crime." (Emphasis omitted.) 62 Ohio St. L.J. at 1221-22.

This axiom was applied by our supreme court in *Savory*, where it instructed that in deciding section 116—3 motions, courts must consider the evidence at trial and also assess the evidence the defendant is seeking to test. *Savory*, 197 Ill. 2d at 214. In assessing the evidence the defendant is seeking to test in the instant case, we find that the pants recovered in the defendant's bedroom and any swabs contained in the Vitullo kit are the only possible source of evidence that may significantly advance the defendant's claim of actual innocence. Consequently, we limit our directive to order DNA testing to be performed solely on the pants and any swabs contained in the Vitullo kit. Of course, on remand the parties are free to agree to conduct DNA testing on whatever evidence they wish.

## CONCLUSION

We affirm the trial court's dismissal of the defendant's postconviction petition claim that his natural life sentence violated the holding in *Apprendi*. We reverse the trial court's denial of defendant's request

for DNA testing as to the bloodstains on the pants recovered from the defendant's bedroom and as to the swabs in the Vitullo kit. We remand the matter to the circuit court with instructions to order the Illinois State Crime Lab to conduct DNA testing on the pants and on the swabs. We further order that both the defendant and the State receive all information relating to testing, as provided in Supreme Court Rule 417 (188 Ill. 2d R. 417).

For the above reasons, we affirm in part, reverse in part, and remand the cause to the circuit court.

Affirmed in part and reversed in part; cause remanded.

GREIMAN and REID, JJ., concur.