NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 231359-U

NO. 4-23-1359

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 25, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| SHAREAF R. FLEMING, | ) | No. 01CF903 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Katherine S. Gorman, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Knecht and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court did not err in denying defendant's motion to test certain evidence because the requested testing lacked the scientific potential to produce evidence materially relevant to defendant's assertion of actual innocence.

¶ 2    In September 2002, a jury found defendant, Shareaf R. Fleming, guilty of first degree murder (720 ILCS 5/9-1(a) (West 2000)) and aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 2000)). In May 2022, defendant filed a motion pursuant to section 116-3(a) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116-3(a) (West 2022)), which allows a convicted defendant to seek "fingerprint, Integrated Ballistic Identification System, or forensic DNA testing" in certain circumstances. Given the evidence at trial and defendant's conviction under an accountability theory, the trial court ruled a "favorable report" from forensic testing would not advance defendant's claims of innocence. We affirm the trial court's decision.

¶ 3                              I. BACKGROUND

¶ 4                    A. Defendant's Conviction and Direct Appeal

¶ 5          At defendant's jury trial, Sam Clark Jr. testified he and his friend Eric Eppinger were talking in a parking lot at Logan Park in Peoria, Illinois, on September 4, 2001, at approximately 7:30 p.m. Both Clark and Eppinger were sitting in the driver's seat of their respective vehicles. The two vehicles were pointed in opposite directions. Clark was sitting in a blue van, and Eppinger was sitting in a yellow Cadillac. After Clark and Eppinger talked for approximately 30 minutes, two Black men, who were both wearing white masks, ran past and shot at Clark and Eppinger. One gunman ran to the passenger side of Eppinger's van; the other ran between the vehicles. Clark tried to hide on the floor of his van. However, one of the gunmen shot him in the back through his driver's side window. Clark indicated he had been shot with what "looked like a chrome 9." He could not describe the other gunman's handgun. After the incident, Clark could hear Eppinger "mumbling," but he did not know how badly Eppinger was injured. A bystander drove Clark to the hospital. Clark indicated he knew defendant before the shooting because he had dated defendant's aunt.

¶ 6          Aiesha Riley testified she was playing basketball at Logan Park and saw two men with white face coverings run out of an alley. One of the masked men shot at a van, and the other man shot at a yellow Cadillac. The two gunmen then ran back into the alley, where a gold van with a mismatched door was waiting. Riley believed she heard six or seven gunshots.

¶ 7          Gene VanAntwerp, an officer with the Peoria Police Department (PPD), testified he was dispatched to Logan Park and saw a large crowd near a yellow Cadillac and a blue van. As he and a park officer started clearing the crowd, someone indicated a person was in "the car." VanAntwerp approached "the vehicle" and noticed "two [cartridge cases] towards [its] right front." The individual in the car had multiple gunshot wounds and was removed by the paramedics.

VanAntwerp then noticed other cartridge cases scattered about the scene.

¶ 8        Eric Ellis, who was part of the PPD Crime Scene Unit, testified he and Kenneth Snow, a PPD crime scene technician, found four spent .380-caliber cartridge cases in the parking lot. The police also found two marks on the Cadillac's hood, which appeared to be bullet ricochet marks. The police also found one cartridge case inside the Cadillac and another inside Clark's van. Ellis also testified he found a partial palm print on the front driver's side door of the van. The palm print and some fingerprints found on the van were suitable for comparison. Ellis was not asked to "check" the fingerprints.

¶ 9        Snow testified he located fingerprints on the hood, windshield, and driver's door of the Cadillac. Those fingerprints did not match standards taken from defendant and were not checked against any database. Snow indicated he collected the six cartridge cases found at the scene. Five out of the six cartridge cases had the same manufacturer. The cartridge case made by a different manufacturer was found in the van.

¶ 10       Mark Chittick, a retired PPD officer, testified he examined Clark's van after it was towed to a PPD garage. He noted the "left front tire *** was flattened" and recovered a "firearm projectile" from that tire.

¶ 11       Steven Cover, a PPD patrol officer, testified he stopped a brown Oldsmobile Cutlass driven by Jamar Murdock on December 20, 2001, because of "a very loud muffler." Two passengers were in the vehicle. Cover searched the car and found a handgun containing a magazine and ammunition under the driver's seat.

¶ 12       Christopher Kozel, a forensic scientist specializing in firearm and toolmark identification with the Illinois State Police (ISP), testified the two recovered bullets were fired from the same weapon. Further, Kozel asserted five of the six recovered spent cartridge cases were

fired from the same weapon. He labeled the nonmatching cartridge case "4-F." Kozel stated no method existed to associate bullets with specific cartridge cases.

¶ 13     Linda Yborra, another ISP forensic scientist specializing in firearm and toolmark identification, testified she test-fired the handgun recovered by Cover on December 20, 2001, from the Oldsmobile Cutlass driven by Jamar Murdock. While the test shots from the weapon did not match either of the recovered bullets from the shooting in this case, the spent cartridge case did match the previously mentioned casing labeled "4-F.".

¶ 14     Mike Mushinsky, a PPD detective, testified he interviewed defendant on September 13, 2001, at the police station. Defendant orally waived his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)). Mushinsky told defendant that Tobias Seiber had implicated defendant, Cortez Trapps, and Germill Murdock in Eppinger's murder. Mushinsky told defendant that Seiber claimed defendant was with Trapps when Trapps fired the fatal shots. According to Mushinsky, defendant initially claimed he had been with his son when the shooting occurred. However, when Mushinsky asked defendant to explain where he had been in more detail, defendant said he did not want to get anyone in trouble. Defendant then admitted he had been with Trapps and Germill Murdock when Eppinger was killed but denied killing Eppinger. Defendant admitted Eppinger and some of his friends tried to rob defendant and some of his friends about a month before the shooting at issue here. Defendant said he, Germill Murdock, and Trapps had decided they were going to shoot Eppinger because of the attempted robbery.

¶ 15     According to Mushinsky, defendant said Germill Murdock drove defendant and Trapps to the park in a van. Both defendant and Trapps were armed and ran across the street bordering the park. Defendant said he fired at Eppinger's car but fired no other shots because his gun jammed. Defendant believed he hit the van parked next to Eppinger's car. Defendant said

Trapps went around to the passenger side of Eppinger's car and shot Eppinger three or four times.

¶ 16        Mushinsky also testified defendant said he and Trapps were wearing white T-shirts wrapped around their faces and ran back to the van, which was parked in an alley, after the shooting. Germill Murdock then drove them to a house on Sommer Street belonging to Jamar Murdock's girlfriend. Defendant, Trapps, and Germill Murdock had left Seiber and Jamar Murdock at the Sommer Street house before they went to shoot Eppinger because Seiber was Eppinger's cousin.

¶ 17        Mushinsky said defendant admitted he used a .380-caliber semiautomatic pistol belonging to Jamar Murdock during the shooting. Defendant told Mushinsky that Trapps had used his own .380-caliber handgun.

¶ 18        In addition, Mushinsky testified defendant later called the PPD on November 15, 2001, to request another interview. In an interview that same day, defendant asked how he could be charged with murder when it was Trapps who killed Eppinger.

¶ 19        The State's next witness was Jamar Murdock. He testified he did not remember anything about a shooting on September 4, 2001, because he "smoke[d] too much weed." He also claimed he did not remember being interviewed on February 6, 2002, about the incident. On cross-examination, he claimed a similar lack of recall.

¶ 20        Over defendant's objection, the trial court allowed the State to play a video of Mushinsky's interview of Jamar Murdock. Mushinsky authenticated the recorded interview as one he conducted on February 6, 2002. Although part of the record on appeal, this court could not play the recording. However, according to the Third District's decision in defendant's direct appeal:

> "The tape contains the following statements made by Jamar [Murdock]. He
> owned the gun that was recovered from the vehicle that he was driving during a

- 5 -

December 2001 traffic stop. [Defendant] had the gun at the September 4 shooting incident. Jamar [Murdock] and Seiber were at Jamar [Murdock's] girlfriend's house from which [defendant], Trapps, and Germill [Murdock] left to go to McDonald's. When they returned, Trapps told Jamar that he 'aired out Eric.' [Defendant] told Jamar [Murdock] that the gun he used had jammed." *People v. Fleming*, No. 3-02-0927 (2004) (unpublished order under Illinois Supreme Court Rule 23).

¶ 21        Defendant elected to testify on his own behalf and denied being in Logan Park on September 4, 2001, or participating in Eppinger's murder. Defendant claimed he was at his son's first birthday party when the shooting occurred. Further, defendant introduced photographs taken at the party during the day and night. Defendant identified himself in these pictures. According to defendant, PPD officers questioned him about Eppinger's death on September 6, 2001, and he then denied knowing anything about the shooting or being in the van seen at Logan Park.

¶ 22        Defendant agreed Detective Mushinsky questioned him at the PPD on September 13, 2001. Defendant testified he told Mushinsky and the other officer present that he had already been interviewed and did not want to answer any questions. Nevertheless, they asked him where he was on September 4, 2001. According to defendant's testimony, he told the officers he had been at his son's birthday party. The officers then told him they had spoken to someone who provided different information. Defendant testified he continued to tell the officers he had been at his son's birthday party and was not involved in the shooting, despite the officers' assertions they had witnesses connecting defendant to Eppinger's death.

¶ 23        In addition, defendant testified Mushinsky spoke with him on November 15, 2001, at defendant's request. Defendant said he asked Mushinsky why the police were saying he had

confessed to a crime which defendant said he did not commit. Defendant indicated he was not asked to give a recorded statement. During his testimony, defendant continued to assert he had been at his son's birthday party when the shooting occurred and his statement to the police on September 4, 2001, was consistent with the testimony he was providing at trial. He denied saying he was with Trapps and Germill Murdock or that he gave a gun back to Jamar Murdock.

¶ 24 Defendant's mother, Sheila Armstrong, and Tiara Donnell provided testimony tending to corroborate defendant's partial alibi. Armstrong said defendant was continuously present from an uncertain time at the birthday party from around 6 p.m. to "somewhere close to 8:00" p.m. Armstong testified she had to return her daughters to foster care between 8 and 8:30 p.m. She indicated defendant had left the party once. However, she thought he left before 5 p.m. and came back 30 or 40 minutes later, having gone to the mall to buy his son a present.

¶ 25 Tiara Donnell testified defendant was present at the party from approximately 3 p.m. until 8:30 or 9 p.m. According to Donnell, defendant left once, shortly after he arrived. However, she admitted she was not paying particular attention to defendant.

¶ 26 Craig Willis, a PPD detective, was called by the State as a rebuttal witness. He testified he and Mushinsky interviewed defendant on September 13, 2001, and corroborated Mushinsky's testimony regarding defendant's inculpatory statements.

¶ 27 The State also introduced certified copies of defendant's convictions for aggravated battery and attempted residential burglary.

¶ 28 Defendant was found guilty on two counts of first degree murder and one count of aggravated battery with a firearm. He was sentenced to consecutive terms of 40 years' imprisonment for first degree murder and 10 years' imprisonment for aggravated battery with a firearm.

¶ 29    In his direct appeal, defendant argued the trial court erred by (1) admitting Jamar Murdock's taped statement, (2) admitting inadmissible hearsay, and (3) allowing the State to impeach him with his prior convictions. According to defendant, the cumulative effect of these alleged errors made his trial unfair. The Third District affirmed the trial court's judgment. *Fleming*, No. 3-02-0927 (unpublished order under Illinois Supreme Court Rule 23).

¶ 30                        B. Defendant's Section 116-3 Motion

¶ 31    On May 20, 2022, defendant filed a motion under section 116-3 of the Code (725 ILCS 5/116-3 (West 2022)), requesting "fingerprint lifts obtained from the crime scene be run against the ISP Automated Fingerprint Identification System (AFIS) and the F.B.I.'s Integrated AFIS system (IAFIS)." Further, with regard to two shirts recovered from the crime scene and possibly used as masks, defendant requested

> "the shirts and any other forensic evidence from the scene, including the impounded evidence, be properly tested for drug chemistry, trace chemistry, toxicology, and microscopy analysis *** and to submit any DNA recovered to the Combined DNA Index System (CODIS) which permits unknown DNA profiles recovered at crime scenes to be searched against DNA profiles from known individuals or from other unsolved cases to identify potential suspects."

According to defendant, identity was an issue at his trial because he (1) maintained his innocence and (2) testified he did not make the inculpatory statements attributed to him by the PPD detectives. Defendant further asserted the evidence at issue had been in the continuous custody of the PPD and other law enforcement agencies.

¶ 32    Defendant argued he could show an association between the T-shirts collected by the police and the crime via an ISP evidence receipt, which he attached as an exhibit. The receipt

showed the PPD had sent the shirts to the ISP Crime Laboratory for gunshot residue testing, which did not occur. A note from the PPD on the receipt stated, "These shirts may have been used as a mask [*sic*] to hide suspects' identity." The receipt did not state how or where the shirts were found.

¶ 33    According to defendant, the evidence he sought had the potential to exculpate him, asserting the evidence could "reveal the actual assailant." Defendant argued:

"Detectives in the case testified that [he] made an oral statement implicating himself in this crime. [He] maintains he never made a statement and has maintained his innocence. Therefore, the testing would significantly advance [his] claim of actual innocence and confirm that his 'confession' was the result of misconduct—because innocent individuals do not normally confess to crimes they did not commit."

¶ 34    In response, the State argued the testing defendant requested could not significantly enhance his claims of innocence. The State asserted the shirts were not found at the scene. Instead, they were found days later in a vehicle that was not at the crime scene. With regard to the fingerprint evidence, the State argued fingerprint comparisons would not matter because "there is no other indication *** that the Defendant touched anything at the scene." Finally, as for the requested ballistic testing, the State asserted the tests would not advance defendant's claim of innocence because it had already been determined that the bullet that killed Eppinger was not fired from the gun defendant fired.

¶ 35    In his reply to the State's response, defendant acknowledged the fingerprints at issue had been compared with his own. However, he argued a comparison with prints in the IAFIS database might reveal "the actual assailant." Further, he argued the DNA of "other suspects," if found on the shirts, would support his innocence claim. As for ballistic testing, defendant stated

he had not requested that type of testing.

¶ 36    The trial court held a hearing on the motion on June 30, 2023. Defendant argued the fingerprints could show other people were present at the shooting in a manner inconsistent with the State's accountability theory.

¶ 37    On August 4, 2023, in a written order, the trial court denied defendant's motion, finding:

"2. The Defendant was convicted on [a] theory of accountability.

3. Even though [section] 116-3 no longer requires the Defendant to show testing would show total vindication, he must still demonstrate a favorable report would advance his claims of innocence [Citation], which is particularly difficult to do where Defendant's guilt is based on accountability ***

4. The Defendant's confession is consistent with the forensic evidence."

¶ 38    Defendant then filed a late notice of appeal, which this court allowed.

¶ 39                              II. ANALYSIS

¶ 40    On appeal, defendant asserts the trial court erred in denying his motion pursuant to section 116-3 of the Code (725 ILCS 5/116-3 (West 2022)) because he sufficiently alleged the requested testing had the scientific potential to advance his claim of actual innocence. He contends evidence implicating someone other than himself or Trapps would be materially relevant. According to defendant, if new evidence showed someone other than him or Trapps was at the crime scene, this would "tend to show [he] was not one of the two shooters." Further, defendant asserts, "If [the white] shirts were to be tested for DNA evidence and evidence was recovered that did not match [him], or even matched another person such evidence would certainly advance his claim that he did not commit the offense."

¶ 41                              A. Section 116-3 of the Code

¶ 42            Section 116-3 of the Code (725 ILCS 5/116-3 (West 2022)) enables a person who has been convicted of a criminal offense to file a motion seeking new forensic testing of appropriately preserved evidence. For a defendant convicted after a trial, the core requirement of section 116-3 is for the motion to show "the result of the testing has the scientific potential to produce new, noncumulative evidence (i) materially relevant to the defendant's assertion of actual innocence *** even though the results may not completely exonerate the defendant." 725 ILCS 5/116-3(c)(1)(i) (West 2022). Our supreme court has interpreted this provision to require the evidence sought by a defendant to tend to significantly advance his or her actual innocence claim. *People v. Savory*, 197 Ill. 2d 203, 213 (2001). According to our supreme court:

> "[T]his court [has] held that evidence which is 'materially relevant to a defendant's actual-innocence claim need not, standing alone, exonerate the defendant; rather, it must tend to 'significantly advance' his claim of actual innocence. The determination of whether forensic evidence significantly advances the defendant's actual innocence claim requires an evaluation of the evidence introduced at trial, as well as the evidence the defendant seeks to test." *People v. Stoecker*, 2014 IL 115756, ¶ 33 (quoting *Savory*, 197 Ill. 2d at 213).

¶ 43            Section 116-3 also requires a defendant to "present a *prima facie* case" tending to show "identity was the issue in the trial *** which resulted in his or her conviction" and "the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect." 725 ILCS 5/116-3(b) (West 2022). We review *de novo* a trial court's ruling on a section 116-3 motion. *Stoecker*, 2014 IL 115756, ¶ 21.

- 11 -

¶ 44                                    B. Defendant's Identity

¶ 45          Given Mushinsky's testimony concerning defendant's inculpatory statements and the recording of Jamar Murdock's statement, the State argues defendant's identity was not "a central issue at his trial." According to the State, "Although defendant did claim that he was at his son's birthday party at the time of the shooting, this alibi defense does not make identity a central issue when weighed against the totality of the evidence presented at trial."

¶ 46          Defendant initially contends the State forfeited this argument by failing to raise it in the trial court. Defendant alternatively contends the State is incorrect about what it means for identity to be a central issue at trial. According to defendant, the State conflates whether it had sufficient evidence to prove defendant's identity with whether defendant's identity was "the issue in the trial" (725 ILCS 5/116-3(b) (West 2022)). Defendant relies on *People v. Henderson*, 343 Ill. App. 3d 1108 (2003), to support his forfeiture argument. However, *Henderson* does not establish the proposition the State forfeited its identity argument on appeal by failing to make the argument in the trial court. *Henderson* merely held, "[I]t is *preferable* that the parties address [the chain-of-custody] requirement in the trial court." (Emphasis added.) *Henderson*, 343 Ill. App. 3d at 1116.

¶ 47          We are not inclined to extend the holding in *Henderson* and doubt whether forfeiture should apply to the State's argument identity was not a central issue at trial. Forfeiture rules are meant to ensure the trial court has the opportunity to correct any errors in the trial court to conserve time and judicial resources. *People v. Davis*, 2024 IL App (3d) 240244, ¶ 17. When identity is *not* a central issue at trial, further forensic testing is unlikely to produce evidence materially relevant to a defendant's assertion of actual innocence. Thus, a reviewing court needs to consider whether identity was a central issue at trial to determine the relevance of new evidence and avoid futile testing.

¶ 48    We now turn to the merits of the State's argument defendant's identity was not a central issue at his trial because the trial evidence effectively settled the question of defendant's identity in the State's favor. However, in relying on the weight of the identity evidence to argue identity was not a central issue at trial, the State's argument fails.

¶ 49    When the State's evidence is largely directed to establishing the defendant was the offender, the offender's identity was the primary issue at trial regardless of the strength of the State's evidence. Our supreme court has stated that the language " 'identity was the issue in the trial' " means "identity was the *central* issue at trial." (Emphasis added.) *People v. Johnson*, 205 Ill. 2d 381, 393 (2002) (quoting 725 ILCS 5/116-3 (West 1998)). More recent cases, notably the Third District's decisions in *People v. Perez*, 2016 IL App (3d) 130784, ¶¶ 24-25, and *People v. Grant*, 2016 IL App (3d) 140211, ¶¶ 18-22, have also held the question of whether identity is the central issue at trial is independent of the strength of the State's evidence regarding identity.

¶ 50                    C. Materially Relevant Evidence

¶ 51    We next turn to the State's argument that defendant's vague speculation about identifying an unknown third party through fingerprint or DNA evidence does not materially advance his innocence claim. The State noted it already had been determined defendant did not leave his fingerprints at the crime scene. According to the State, the results of any additional fingerprint analysis would constitute cumulative evidence. As for potential DNA evidence, the State asserts defendant did not identify any specific suspect or suspects who he believed may have left DNA evidence that could potentially exonerate defendant. According to the State, defendant had to do more to prevail on a motion pursuant to section 116-3. The State points to our supreme court's decision in *Savory*, 197 Ill. 2d at 215, in which it upheld the denial of a section 116-3 motion because "a test result favorable to [the] defendant would not significantly advance his claim

- 13 -

of actual innocence, but would only exclude one relatively minor item from the evidence of guilt marshaled against him by the State."

¶ 52    However, defendant essentially argues the evidence he wants examined could identify the actual shooters in this case, which would be new, materially relevant evidence that advances his actual innocence claim. Defendant notes the State's theory of the case at trial was that defendant was present at the scene and shot at the two vehicles. According to defendant's reply brief, if the requested new testing reveals the fingerprints match two other individuals, this evidence would "go[ ] to the heart" of the State's theory defendant was one of the two shooters at the park.

¶ 53    "The determination of whether forensic evidence significantly advances the defendant's actual innocence claim requires an evaluation of the evidence introduced at trial, as well as the evidence the defendant seeks to test." *Stoecker*, 2014 IL 115756, ¶ 33. The State presented strong evidence defendant was involved in generating and executing a plan to shoot Eppinger in which he and Trapps would be the gunmen.

¶ 54    According to Mushinsky's testimony, defendant admitted being one of the gunmen in the shooting which killed Eppinger. In addition, Mushinsky stated defendant admitted the plan was developed because Eppinger and his friends tried to rob a group of people which included defendant. Willis corroborated Mushinsky's account of the interview where defendant inculpated himself. In addition, the recording of Jamar Murdock's statement to the police corroborated Mushinsky's and Willis's testimony that defendant said he was one of the gunmen and his weapon jammed during the shooting. Therefore, because the State's evidence was strong, any evidence produced under the motion would have to *clearly and directly* undermine the State's evidence.

¶ 55    In this case, defendant's identity as one of the gunmen and his accountability are linked. Evidence tending to show defendant was not one of the gunmen would cast doubt on the reliability of Mushinsky's testimony and Jamar Murdock's statement, which would affect the strength of the State's evidence defendant was guilty under an accountability theory. As a result, we conclude it would be overly technical to rule defendant would not be entitled to relief under section 116-3 because identity was merely one of two equally important issues.

¶ 56    However, it is unclear how the fingerprints found on either Clark's or Eppinger's vehicles could establish the actual identity of the shooters. Although Clark testified someone reached into his van to shoot him, no evidence suggests the shooter touched the vehicle or that the shooter would have naturally touched the vehicle during the shooting. To be sure, the shooter *might* have touched the vehicle. However, this would be true of anyone who entered the vehicle, walked near it, or came to the vehicle's window to speak to someone inside.

¶ 57    The same is true regarding any fingerprints on Eppinger's vehicle. No evidence related to the shooting suggests the person who shot Eppinger came close enough to his vehicle to touch it. Moreover, nothing in the evidence requires the conclusion the fingerprints were left at the time of the shooting. Therefore, even if the fingerprints could be linked to someone other than defendant, such evidence would not significantly advance defendant's claim of actual innocence.

¶ 58    Turning to defendant's request to test the T-shirts for DNA, defendant implies the link between the shirts and the shooting can be adequately inferred from the evidence receipt showing the PPD submitted the shirts for gunshot residue testing. Although we are skeptical of the strength of the connection, we recognize the State likely would not have sent the shirts for gunshot residue testing unless it had evidence to tie the shirts to the shooting. Regardless, defendant fails to explain how DNA from a person other than defendant or Trapps would implicate this other

person as one of the shooters. Defendant likely hoped testing the shirts would lead to a DNA profile for a different, identifiable person who would be a plausible suspect. However, based on the evidence in this case, this would only amount to an unexplained finding and not material evidence relevant to defendant's actual innocence claim.

¶ 59　　　　As a result, we conclude the trial court did not err in denying defendant's section 116-3 motion because defendant's requests did not have "the scientific potential to produce new, noncumulative evidence *** materially relevant to the defendant's assertion of actual innocence." 725 ILCS 5/116-3(c)(1) (West 2022).

¶ 60　　　　　　　　　　　　　　　III. CONCLUSION

¶ 61　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 62　　　　Affirmed.