2020 IL App (3d) 160675

Opinion filed July 13, 2020

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| | ) | Appeal No. 3-16-0675 |
| v. | ) | Circuit No. 15-CF-164 |
| | ) | |
| TODD L. JOHNSON, | ) | Honorable |
| | ) | John P. Vespa, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE O'BRIEN delivered the judgment of the court, with opinion.
Justice Holdridge concurred in the judgment and opinion.
Justice Schmidt dissented, with opinion.

**OPINION**

¶ 1        Defendant, Todd L. Johnson, appeals following his conviction for armed robbery. He
raises the following six arguments on appeal: (1) defense counsel rendered ineffective assistance
by failing to request certain DNA testing, (2) the court erred in striking defendant's motion to
quash arrest, (3) the jury's guilty verdicts for both armed robbery and aggravated robbery were
legally inconsistent, (4) the court erred in failing to consider defendant's request for DNA
testing, (5) the court committed plain error when it conducted a portion of *voir dire* in chambers
without defendant present, and (6) the court applied an erroneous procedure in considering

defendant's claim under *Batson v. Kentucky,* 476 U.S. 79 (1986). We vacate defendant's conviction and remand for a new trial.

¶ 2                                    I. BACKGROUND

¶ 3        The State charged defendant via indictment with armed robbery (720 ILCS 5/18-2(a)(2) (West 2014)) and aggravated robbery (*id.* § 18-1(b)(1)).

¶ 4        Prior to trial, defendant filed a "Motion to Quash Arrest" and, later, an "Amended Motion to Quash Arrest." In the amended motion, defendant alleged that he had been arrested without a warrant and without probable cause. As relief, defendant requested that the court quash his arrest and immediately release him from custody. Defendant also sought "[a]ny and all other relief the Court deems just and equitable under the circumstances."

¶ 5        On March 17, 2016, the State orally moved to strike defendant's motion. The State argued that there was no relief that the court could grant because "the motion to quash arrest is not something that is statutor[ily] available." Defense counsel argued that the search warrant in the case "flow[ed]" from the illegal arrest. The court granted the State's motion to strike, commenting on the motion to quash arrest: "I'm not allowed to grant it by law."

¶ 6        Jury selection in defendant's case commenced on June 27, 2016. During *voir dire*, prospective juror Kimberlea Tillman indicated that she had an issue that might prevent her from serving on the jury. She indicated that she would be more comfortable discussing that issue in the court's chambers than in open court. Accordingly, the court invited Tillman, defense counsel, and the prosecutor into chambers to discuss the issue.

¶ 7        In chambers, Tillman indicated that she had medical appointments scheduled for the following Thursday and Sunday. The court noted that the case was unlikely to go past Wednesday, but the State pointed out that "we never know how long a jury [is] going to

2

deliberate." The State requested that Tillman be removed for cause. Tillman indicated that the Thursday appointment could "probably" be pushed to Friday if necessary, and could potentially even be combined with the Sunday appointment. The court denied the State's request to remove Tillman for cause. The State indicated that it would exercise a peremptory challenge with respect to Tillman.

¶ 8    In open court, the court excused Tillman. Defense counsel requested a sidebar. After the venire was removed from the courtroom, the court explained that defendant had raised a *Batson* challenge. The court explained for the record that both defendant and Tillman were African American. The court also noted that one African American person had already been seated on the jury, while another remained a potential juror. The court then explained the procedure to be followed:

> "The party making the *Batson* claim must establish a *prima facie* case of purposeful discrimination. Evidence must be produced sufficient to permit the trial judge to draw an inference that discrimination has occurred. Then the burden would shift to the other party to articulate a race-neutral reason, and I will weigh the evidence and make a decision."

¶ 9    Defense counsel argued: "[A]s the court identified on the record, the ethnicity of both the defendant as well as the perspective [*sic*] juror. I would submit that it is being used as a basis to affect the ability to empanel the jury based on race." The court enquired: "And that was it?" Defense counsel responded: "That's it."

¶ 10   The court then asked the State if it had anything to add. The State asserted that *prima facie* evidence required a pattern of race-based strikes. The State pointed out that there had

3

been no such pattern. The State concluded: "[T]he defendant has not met his burden initially, and we would ask the Court to rule accordingly."

¶ 11 The court then stated: "I am finding that defense [*sic*] has not established a *prima facie* case of purposeful discrimination." The court then opined that it was clear the State was removing Tillman because of her medical appointments, and noted that "[i]t was a tough call" to not remove her for cause.

¶ 12 At trial, Aaron Ferguson testified that he was working as a clerk at a gas station located on West Forrest Hill Avenue in Peoria on the morning of March 10, 2015. Around 8 a.m., a person entered the gas station, carrying a black gun and demanding money. Ferguson described the person as wearing a white track jacket with the hood pulled up. The person was also wearing a mask. Ferguson testified that the person struck him multiple times in the head with the gun.

¶ 13 Surveillance video from the gas station shown at trial depicts an African American male wearing a white, zippered jacket with gray panels on the sides. The man is seen wearing a white hood, which appears to be part of an under layer, rather than attached to the jacket. He appears to be wearing a black stocking cap underneath the hood and mask of sorts covering the lower half of his face. The man is wearing black gloves and is holding what appears to be a black handgun. The gun appears to have a silver or gray ejector port. He is carrying a black, satchel-type bag that he places on the counter when he enters. The man keeps the gun pointed at Ferguson through most of the incident. A struggle between the two men ensues, and Ferguson is struck multiple times with the gun. Exterior footage from after the altercation shows the man moving briskly to Forrest Hill Avenue, then turning in the direction of Wilson Drive.

¶ 14 Earl Hensley testified that he was doing a home repair job one block from the gas station on the morning in question. He was sitting in his van, waiting for his coworkers to arrive, when

4

he noticed a white Cadillac parked on the side of the road. The Cadillac was running, but no one was inside. Hensley testified that he saw a man running from the direction of Forrest Hill Avenue turn on Wilson Drive. The man ran past Hensley's van and then entered the white Cadillac. Hensley observed that the man was wearing a hooded jacket and a stocking cap. The man drove away.

¶ 15 Later, Hensley rode with a police officer in order to determine if Hensley could make an identification. When they reached their destination, Hensley was able to identify the white Cadillac he had observed earlier. The officer pulled his vehicle into an ally, at which point a man "came out of the house and walked past the front of the squad car." Hensley identified the man as the one who had run past his van earlier. In court, Hensley identified that man as defendant.

¶ 16 Detective Craig Williams responded to the robbery call and received a description of the white Cadillac. Williams believed he was familiar with the vehicle in question and, along with Detective Richard Linthicum, was able to locate the white Cadillac parked in an alley behind a house at 1810 New York Avenue. As Williams and Linthicum surveilled the car, a man exited the house, removed "something black" from the white Cadillac, and began walking to the garage. The man then returned to the house. Williams identified defendant as the man he saw.

¶ 17 Williams testified that he informed Detective Steven Garner that he had located the white Cadillac. After Garner arrived with Hensley, defendant again left the house. When Garner tried to make contact with defendant, defendant ran, but was apprehended by Linthicum after a brief chase. Linthicum testified that while he and Williams were watching the white Cadillac, defendant retrieved a black bag from the car and then entered the garage.

¶ 18 Officer Brian Terry testified that he secured the residence at 1810 New York Avenue while a search warrant was obtained. After the court issued the search warrant, Terry participated

5

in the search of the house. Terry talked to Angel Patterson, who directed him to the bottom drawer of her dresser, where Terry found a black handgun. Terry described the gun as belonging to Patterson. Terry then searched the garage, where he found a second "firearm." Photographs admitted of the weapon found in the garage show it to be black with exposed silver or gray portions on top where the slide is missing. The handle is wrapped in black tape and a spring is coiled loosely around the top front portion of the weapon.

¶ 19    On cross-examination, Terry confirmed that the weapon found in the garage turned out to be a broken BB gun. Terry agreed that the BB gun was "solid black." Terry agreed that the gun found in Patterson's dresser was in a box underneath some folded clothes.

¶ 20    Paul Tuttle testified that, in addition to the gun, the crime scene unit found in the house a white hooded sweatshirt and a black ski mask. Photographs show the ski mask to have a zippered portion that would cover the chin, mouth, and lower portion of the nose. Tuttle swabbed the gun for potential DNA because he knew Ferguson had been struck with it. No DNA testing was ever requested on those swabs.

¶ 21    Patterson testified that she owned the black firearm found at 1810 New York Avenue. The gun was in the same location—under folded clothes in her bottom dresser drawer—as the last time she had seen it. She testified that no one else in the house knew about the gun.

¶ 22    Alesha List, a secretary from defense counsel's office, made still photographs from the surveillance video. She testified that the photograph appeared to show a gun in the robber's hand. When defense counsel asked List whether "the discharge chamber, where bullets are ejected" was a different color from the rest of the gun, List responded affirmatively, testifying that that area was silver or gray.

¶ 23    In its closing argument, the State repeatedly asserted that defendant had a gun or firearm during the robbery. In reciting the propositions with respect to armed robbery, the State continued to argue that defendant had a firearm during the robbery. After summarizing the propositions with respect to aggravated robbery, the prosecutor declared: "Now, you have two guns that were located. You have a gun, a firearm, and you have a BB gun. And I would submit to you that the aggravated robbery goes towards that BB gun."

¶ 24    In defense counsel's closing, he argued, in part, that no DNA was found in the case. Counsel criticized the investigators for failing to conduct tests for DNA.

¶ 25    During deliberations, the jury sent a written question to the court, asking: "Why wasn't anything tested for DNA?" The court responded only by telling the jury it was to consider the evidence before it.

¶ 26    After the jury began its second day of deliberations, defense counsel brought to the court's attention a question raised by defendant. Counsel proceeded: "[Defendant] doesn't understand why the Court could not order the DNA buccal swab to be tested, because it was collected, as the officer indicated, but it never got tested." The court responded that it would not suspend deliberations and reopen proofs.

¶ 27    The court inquired why such a request was not made weeks or months earlier. Defense counsel replied that Tuttle's testimony had come as a surprise, as discovery had not revealed that a DNA swab had been taken from the gun. The State interjected, pointing out that "the discovery did show that a DNA swabbing of the gun was done," though there was no indication that any biological material was present on the gun. Defense counsel withdrew his request.

¶ 28    The jury found defendant guilty on both counts. In the four months between the return of that verdict and sentencing, defendant sent three letters to the court, requesting that the swabs

7

from the gun be tested for DNA. At sentencing, defendant continued to profess his innocence and asked the court to have the swabs tested. The court found it was not required to respond to that request.

¶ 29    The court found that the armed robbery and aggravated robbery counts would merge and imposed a sentence of 33 years' imprisonment for armed robbery. That sentence included a 15-year mandatory firearm enhancement.

¶ 30                                    II. ANALYSIS

¶ 31    Defendant raises the following six arguments on appeal: (1) defense counsel rendered ineffective assistance by failing to request certain DNA testing, (2) the court erred in striking defendant's motion to quash arrest, (3) the jury's guilty verdicts for both armed robbery and aggravated robbery were legally inconsistent, (4) the court erred in failing to consider defendant's request for DNA testing, (5) the court committed plain error when it conducted a portion of *voir dire* in chambers without defendant present, and (6) the court applied an erroneous procedure in considering defendant's *Batson* claim.

¶ 32                       A. Ineffective Assistance of Counsel

¶ 33    First, defendant argues that defense counsel rendered ineffective assistance for failing to request testing of the DNA swabs at any point prior to jury deliberations.

¶ 34    A claim of ineffective assistance of counsel is analyzed under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Id.* A strong presumption exists that counsel's conduct was within the wide range of reasonable professional assistance and that all decisions were made in the exercise of reasonable professional judgment. *People v.*

8

*Palmer*, 162 Ill. 2d 465, 476 (1994). Matters pertaining to trial strategy will usually not support a claim of ineffective assistance of counsel, even if counsel made a mistake in trial strategy or tactics or made an error in judgment. *People v. Perry*, 224 Ill. 2d 312, 355 (2007). Prejudice is demonstrated where a defendant shows that a reasonable probability exists that, but for counsel's deficient performance, the result of the trial would have been different. *People v. Enis*, 194 Ill. 2d 361, 376 (2000). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Washington*, 466 U.S. at 694.

¶ 35    A defense attorney's decision to not have a DNA swab tested where, as here, the State has conducted no testing would ordinarily be considered a clear matter of trial strategy. Counsel could reasonably decide that the potential of the test results coming back in defendant's favor are outweighed by the risk that the results are actually incriminating. Moreover, counsel may find value in attacking the State's failure to conduct the testing, as did counsel here.

¶ 36    The presumption of sound trial strategy, however, is rebutted by the record in this case. Counsel did not make the informed choice to forego testing for any of the reasons set forth above. Rather, it appears that counsel was under the misapprehension that no DNA swabs had been taken from the firearm. In fact, the State asserted that counsel had been put on notice of the DNA swabs via discovery. Neither party on appeal disputes that characterization. As the failure to request DNA testing on the swabs was oversight rather than strategy, we find that defense counsel rendered deficient performance.[1]

¶ 37    Turning to the question of prejudice, there is no dispute that testing of the swabs would have been conducted had counsel made the appropriate request. See Ill. S. Ct. R. 412 (eff. Mar. 1, 2001). The State argues, however, that no possible result of that testing could have created a

---

[1]Notably, the State on appeal does not dispute that defense counsel rendered deficient performance. Rather, it argues only that defendant suffered no prejudice.

probability of a different result at trial. The State continues: "[E]ven if the swabs taken off the gun had been tested and produced no evidence of the presence of the victim's DNA, or if it produced the DNA of some third party, it does not necessarily follow that defendant was innocent of perpetrating the armed robbery."

¶ 38 We disagree with the State's assertion. Initially, the prejudice component of the ineffectiveness test does not require a defendant to establish that the result at a new trial would "necessarily" be different. Rather, defendant must only show a reasonable probability of such a different result. *Enis*, 194 Ill. 2d at 376. A negative DNA result on testing of the firearm swabs in this case would create a strong probability of a different result at retrial. Ferguson testified that the perpetrator struck him repeatedly over the course of the robbery, testimony that was supported by the surveillance footage. If the gun found in Patterson's drawer was discovered to not contain Ferguson's DNA, this would be convincing evidence that that gun was not the one wielded during the robbery.

¶ 39 Such a result would be especially relevant in this case, given that the police found a similarly colored BB gun. Defendant was charged with armed robbery, which requires the carrying of an actual firearm in the commission of a robbery. 720 ILCS 5/18-2(a)(2) (West 2014). A BB gun is generally not considered a firearm for the purposes of the armed robbery statute. 430 ILCS 65/1.1 (West 2014); 720 ILCS 5/2-7.5 (West 2014). Defendant was also charged with aggravated robbery, which is committed where a person merely indicates "to the victim that he or she is presently armed with a firearm or other dangerous weapon." 720 ILCS 5/18-1(b)(1) (West 2014).

¶ 40 In order to find defendant guilty of armed robbery, the jury would have to find that defendant bludgeoned Ferguson with the actual firearm. If defendant carried the BB gun in the

10

course of the robbery, he would be guilty only of *aggravated* robbery. Thus, DNA testing on the firearm is of even greater importance. If Ferguson's DNA was not found on the firearm, it would tend to cast doubt that defendant was the perpetrator of the robbery. Even if the jury could still conclude that defendant was the perpetrator, the lack of Ferguson's DNA on the firearm would severely undermine the notion that defendant carried the firearm, rather than the BB gun, during the robbery. This would create a strong chance that the jury would conclude that defendant had instead used the BB gun in the robbery. That conclusion would mandate an acquittal on the armed robbery charge and a conviction only on the lesser aggravated robbery charge. It would also dispense with the 15-year firearm enhancement attached to defendant's sentence. *Id.* § 18-2(a)(2), (b).

¶ 41        To be sure, the possibility exists that testing on the DNA swabs would reveal the presence of Ferguson's DNA. It is thus possible that defendant, rather than being prejudiced by counsel's deficient performance, actually benefitted from it. In the strictest sense, then, defendant could only establish prejudice by demonstrating that Ferguson's DNA would not have been found. Such speculation is impracticable and inequitable. Where a defendant claims that counsel was ineffective for failing to request DNA testing, it would be paradoxical to require that the defendant present the results of those tests to support his claim of prejudice. It is the lack of those test results that forms the very basis of the claim. Indeed, such a holding would foreclose the possibility of a defendant *ever* bringing a claim like that raised in this appeal. Where a negative result would so evidently impact the result of the trial, the lack of such testing clearly undermines confidence in the result. *Washington*, 466 U.S. at 694. Accordingly, we find that a defendant need only demonstrate that a negative DNA result would probably change the outcome of the trial in order to establish prejudice in this context.

11

¶ 42    Defense counsel in the present case rendered deficient performance when he mistakenly failed to request vital DNA testing. That error caused prejudice to defendant, as a negative DNA test would likely have resulted in, at the very least, an acquittal on the armed robbery charge. We therefore find that defendant received ineffective assistance of counsel, vacate defendant's conviction, and remand for a new trial.

¶ 43                              B. Remaining Arguments

¶ 44    Our vacatur of defendant's conviction and remand for a new trial obviates the need to discuss the remaining five issues. The issues relating to the jury verdicts and defendant's posttrial motion for DNA testing are necessarily moot as the result of our order for a new trial. Similarly, the two issues relating to jury selection need not be addressed, as defendant's new trial will naturally be preceded by a new jury selection.

¶ 45    Finally, we note that defendant's pretrial "Motion to Quash Arrest" was stricken by the circuit court, rather than ruled upon on the merits. Defendant's argument on appeal makes clear that he sought to have certain items suppressed from evidence. Defense counsel on remand is free to file a motion seeking suppression of that evidence, to be ruled upon for the first time by the circuit court.

¶ 46                              III. CONCLUSION

¶ 47    For the foregoing reasons, we vacate the judgment of the circuit court of Peoria County and remand for a new trial.

¶ 48    Judgment vacated and remanded for a new trial.

¶ 49    JUSTICE SCHMIDT, dissenting:

12

¶ 50                        I. Ineffective Assistance of Counsel

¶ 51        The majority reasons that defense counsel's failure to request DNA testing on the swabs taken from the gun could not have been a matter of trial strategy, as the record shows that counsel was unaware that any swabs were available for testing. I agree.

¶ 52        However, defendant is presently unable to demonstrate that he suffered any prejudice as a result of counsel's mistake. The mere testing of the swabs is not inherently beneficial to defendant's case. After all, the testing could show the presence of Ferguson's DNA, all but confirming that it was the gun used to strike Ferguson, and severely undermining defendant's case. In order to show a reasonable probability that such testing would lead to a different trial outcome, defendant needs to show a reasonable probability that the results of said testing would be helpful—that is, a result that failed to show either defendant's or Ferguson's DNA on the gun. Since no DNA testing has been done on the gun, defendant *cannot* show any prejudice.

¶ 53        In *People v. Scott*, 2011 IL App (1st) 100112, the First District considered this precise issue. The defendant in that case argued that trial counsel had been ineffective for failing to request DNA testing on a shirt. The reviewing court rejected that argument on the grounds that defendant was fundamentally unable to demonstrate prejudice:

> "[A]t this time, defendant cannot establish prejudice under *Strickland*. Any argument regarding exculpatory evidence contained on the blue shirt is speculative. Since no test has been performed, we do not know if sufficient DNA is on the shirt and able to be tested let alone whether the results would be exculpatory. *** *Without test results, we cannot say whether a reasonable probability exists that the result of defendant's trial would have been different such that defendant was prejudiced*. Any

13

opinion would be advisory since at this juncture, no exculpatory evidence exists. *** Accordingly, defendant's claim of ineffective assistance of trial counsel for failure to pursue DNA testing lacks merit." (Emphasis added.) *Id.* ¶ 31.

¶ 54    The majority concedes that it is "possible that defendant, rather than being prejudiced by counsel's deficient performance, actually benefitted from it." *Supra* ¶ 41. In an effort to circumvent this obstacle, the majority has a created a new prejudice test to be applied to situations like these. Under this new test, the majority finds that prejudice is established where a defendant can show "that a negative DNA result would probably change the outcome of the trial." *Supra* ¶ 41. In other words, the majority's new test allows a defendant to assume, for the purposes of establishing ineffective assistance, that any DNA tests will come out in his favor. There is no precedential support for allowing such a windfall to a defendant.

¶ 55    The majority bases its new test on notions of fundamental fairness, insisting that a reviewing court should not require DNA test results when a defendant's very claim is premised upon the lack of DNA testing. The majority concludes: "[S]uch a holding would foreclose the possibility of a defendant *ever* bringing a claim like that raised in this appeal." (Emphasis in original.) *Supra* ¶ 41. Wrong! Defendant would still be entitled to seek DNA testing under section 116-3 of the Code of Criminal Procedure of 1963 (Code). 725 ILCS 5/116-3 (West 2014). If the ensuing testing returned results that were beneficial to defendant, he could raise a claim of ineffective assistance of counsel in a postconviction petition.

¶ 56    At the moment, with no DNA testing having been done, it is impossible to say that defendant suffered any prejudice from that lack of testing. This court should not assume that any

14

such testing will be to defendant's benefit. Without the ability to show prejudice, defendant has failed to establish that defense counsel rendered ineffective assistance.

¶ 57                                    II. Remaining Arguments

¶ 58        In addition to his ineffectiveness argument, defendant also contends on this appeal that (1) the court erred in striking his "motion to quash arrest," (2) the guilty verdicts for both armed robbery and aggravated robbery were legally inconsistent, (3) the court erred in failing to consider defendant's request for DNA testing, (4) the court erred when it conducted a portion of *voir dire* in chambers without defendant present, and (5) the court applied an erroneous procedure in considering defendant's *Batson* claim. As the majority vacates defendant's conviction on ineffectiveness grounds, it has no need to address those arguments. Because I would find that defense counsel was not ineffective, I will address them.

¶ 59        Many of defendant's additional arguments are meritless on their face and need be discussed only briefly. For instance, guilty verdicts for armed robbery and aggravated robbery are plainly not inconsistent. A person carrying a gun in the course of a robbery can also indicate by his words or actions that he is armed, thus satisfying both statutes. 720 ILCS 5/18-2(a)(2) (West 2014) (armed robbery); *id.* § 18-1(b)(1) (aggravated robbery). Next, defendant's right to be present is only violated where his absence results in the denial of a fair and impartial trial. *People v. Bean*, 137 Ill. 2d 65, 83 (1990). Defendant's absence from a portion of *voir dire* necessarily could not have impacted his trial in any way, as the juror questioned in chambers was ultimately excused. Finally, the court was correct in finding the defendant's posttrial request for DNA testing premature. Under section 116-3 of the Code, such a request must be directed at "the trial court that entered the judgment of conviction in [defendant's] case." 725 ILCS 5/116-3 (West 2014). A judgment of conviction includes, by definition, the pronouncement of sentence;

15

thus, until defendant was sentenced, he could not bring a motion under section 116-3. See *id.* § 102-14. I would point out that defendant was free to make a section 116-3 testing request from the moment he was actually sentenced through the present, yet he has apparently not done so.

¶ 60     Defendant's argument that the circuit court employed an improper *Batson* procedure also lacks merit. He insists that the court improperly collapsed the first *Batson* step—requiring defendant to make a *prima facie* showing of discrimination—with the second *Batson* step, which requires the State to provide a race-neutral reason for its strike. See *People v. Wiley*, 156 Ill. 2d 464, 475 (1993) (finding error where first two steps of *Batson* procedure are collapsed into one). Here, the court properly outlined the correct *Batson* procedure, making clear at the outset that its initial inquiry would be limited to defendant's *prima facie* showing. See *supra* ¶ 8. After allowing defense counsel to make his case, the court asked the State for its input. While the second step of the *Batson* process calls on the State to provide a race-neutral explanation for its strike, there is no case law indicating that the State is barred from participating at the first step. Indeed, the State properly limited its argument to defendant's ability to make a *prima facie* showing. While the court did, after the fact, suggest a possible race-neutral reason for the strike, it never solicited that reason from the State in the context of the *Batson* process. Accordingly, I would find that the court did not collapse the first two steps of the *Batson* procedure.

¶ 61     Finally, we come to defendant's argument that the circuit court erred in striking his "motion to quash arrest." The court correctly found that defendant's "motion to quash arrest" was not a cognizable motion upon which it could rule.

¶ 62     Section 114-12 of the Code, titled "Motion to Suppress Evidence Illegally Seized," provides that a defendant may move the court for the return of property and suppression of evidence. 725 ILCS 5/114-12(a) (West 2014). The Fourth District has pointed out that, under

16

section 114-12, "[s]uppressing the evidence obtained by the police as a result of an improper stop is the entirety of the relief to which a defendant is entitled. *** Nothing in that section refers to or deals with purported 'motions to quash arrest.' " *People v. Hansen*, 2012 IL App (4th) 110603, ¶ 63. As a result, the court urged that criminal defendants "should stop filing such motions." *Id.*

¶ 63    In *People v. Ramirez*, 2013 IL App (4th) 121153, ¶¶ 56-61, the court again emphasized that a "motion to quash arrest" is not a cognizable motion. "Throughout this opinion, we have advisedly put the term 'motion to quash arrest' in quotation marks so as to avoid giving any legitimacy to such a motion. In fact, such motions possess none. 'Motions to quash arrest' are nowhere recognized in the Code ***." *Id.* ¶ 56. The court also pointed out that the Code was not the only source lacking any reference to a "motion to quash arrest":

> "[R]egarding the subject of 'motions to quash arrest' generally, we note that the use of such motions has apparently not come to the attention of Professor LaFave despite his more than 50 years on the faculty of the University of Illinois College of Law and his authorship of the nation's definitive treatise on the subject of search and seizure. That treatise is comprised of six volumes containing thousands of pages and is universally recognized as the nation's definitive work on search and seizure law. Indeed, it is frequently cited by the United States Supreme Court whenever that Court is dealing with search and seizure cases. Yet, despite the overall comprehensiveness of Professor LaFave's work, its thousands of pages, and his professorship in the State of Illinois, his treatise on

17

search and seizure law contains no mention whatsoever of 'motions to quash arrest.' We conclude this absence is no oversight." *Id.* ¶ 61.

¶ 64 More recently, the Fourth District contemplated what steps a circuit court faced with a "motion to quash arrest" should take:

> "If a trial court receives a 'motion to quash arrest,' it should not accept it for consideration and should point out to counsel the motion is inappropriate for the reasons this court explained in *Hansen* and *Ramirez*. The court should then give the counsel who filed the inappropriate motion the opportunity to file a proper motion to suppress under section 114-12 of the [Code]. *** 'Motion to quash arrest' is an arcane phrase that has a ring of authenticity but is actually meaningless verbiage." *People v. Winchester*, 2016 IL App (4th) 140781, ¶ 30.

¶ 65 This court has never expressly endorsed the reasoning set forth in the line of cases from the Fourth District. In a recent case, we observed that "[t]he Fourth District presents a compelling case that the quashing of an arrest is of no particular import." *People v. Motzko*, 2019 IL App (3d) 180184, ¶ 19. The facts in *Motzko*, however, did not require this court to weigh in on the continued propriety of motions to quash arrest.

¶ 66 The Fourth District got it right. A "motion to quash arrest" is not a motion referenced in the Code. Nor is the actual quashing of an arrest a judicial remedy contemplated anywhere in the Code.

¶ 67 Such a holding would be limited in two important ways. First, it is rather common for a motion to be styled as a "motion to quash the arrest and suppress evidence" or something similar. *E.g.*, *People v. Rice*, 2019 IL App (3d) 170134, ¶ 5. In these instances, the motion to suppress is

18

a cognizable motion (725 ILCS 5/114-12(a) (West 2014)), and the additional request for quashing of arrest may be deemed harmless surplusage. Furthermore, even where a motion is *only* labeled as a "motion to quash arrest," courts would apply the well-settled doctrine that "it is a motion's substance, not its title, that controls its identity." *People v. Helgesen*, 347 Ill. App. 3d 672, 677 (2004). That is, where a "motion to quash arrest" identifies specific evidence seized, states facts showing said seizure to be unlawful, and requests suppression of that evidence, it is in substance a proper motion to suppress.

¶ 68        It is the latter point that defendant argues in reply. He insists that "[it] is *** apparent" that in his motion to quash arrest, "defendant sought to suppress the evidence recovered from his home based on his unconstitutional arrest."

¶ 69        Under section 114-12 of the Code, a defendant may challenge the legality of a search and seizure conducted pursuant to a warrant on the grounds that "the warrant is insufficient on its face; the evidence seized is not that described in the warrant; there was not probable cause for the issuance of the warrant; or, the warrant was illegally executed." 725 ILCS 5/114-12(a)(2) (West 2014). The motion must "state facts showing wherein the search and seizure were unlawful." *Id.* § 114-12(b).

¶ 70        Defendant's "amended motion to quash arrest" simply cannot be construed as a motion to suppress evidence. First, defendant never actually requests the suppression of any evidence, either implicitly or explicitly. The only specific relief prayed for by defendant was the quashing of his arrest and his immediate release from custody. Further, while the evidence now in question was seized pursuant to a search warrant, defendant never argues how that warrant was deficient. In fact, he never even mentions that warrant. Defendant's argument that he was arrested without

19

probable cause is not inherently an argument that there was no probable cause for the issuance of the later search warrant.

¶ 71    In sum, the motion filed by defendant cannot, even through the most liberal construction, be deemed a motion to suppress evidence. As the "motion to quash arrest" had no statutory or other basis under the law, the circuit court properly struck the motion. Finally, I would point out that defendant and counsel were put on notice that the "motion to quash arrest" was not statutorily available and that the court could not by law grant such a motion. Defendant suffered no immediate prejudice from the court's ruling, as his trial would not begin for another three months. Defendant had ample time to file a proper motion to suppress evidence but failed to do so.

**No. 3-16-0675**

| | |
|---|---|
| **Cite as:** | *People v. Johnson*, 2020 IL App (3d) 160675 |
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 15-CF-164; the Hon. John P. Vespa, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Peter A. Carusona, and Bryon Kohut, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | Jerry Brady, State's Attorney, of Peoria (Patrick Delfino, Thomas D. Arado, and Gary F. Gnidovec, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |