**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 160675-UB

Order filed August 18, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-16-0675 Circuit No. 15-CF-164 |
| TODD L. JOHNSON, | ) ) ) | Honorable John P. Vespa, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE O'BRIEN delivered the judgment of the court.
Justices Holdridge and Peterson concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*: (1) The verdicts were not legally inconsistent, (2) the court did not err in failing to consider defendant's request for DNA testing, (3) the court properly struck defendant's motion to quash arrest, (4) the court did not commit plain error by questioning a prospective juror when defendant was not present, and (5) the correct procedure was applied following defendant's *Batson* challenge.

¶ 2     Defendant, Todd L. Johnson, initially appealed following his convictions for armed robbery and aggravated robbery. Initially, this court found trial counsel provided ineffective assistance for failing to test DNA swabs taken from a gun discovered on the premises where

defendant was arrested. *People v. Johnson*, 2020 IL App (3d) 160675. We vacated defendant's convictions for aggravated robbery and armed robbery and remanded for a new trial. The supreme court subsequently granted the State's petition for leave to appeal, and reversed our judgment, finding that counsel was not ineffective. *People v. Johnson*, 2021 IL 126291. The supreme court remanded the cause to this court to address the issues rendered moot by our prior ruling. We now review defendant's arguments that: (1) the guilty verdicts were legally inconsistent, (2) the Peoria County circuit court erred in failing to consider defendant's request for DNA testing, (3) the court erred in striking defendant's motion to quash arrest, (4) the court erred when it questioned a prospective juror in chambers without defendant present, and (5) the court did not apply the correct procedure in considering defendant's *Batson* claim.

¶ 3                                I. BACKGROUND

¶ 4        The State charged defendant with armed robbery (720 ILCS 5/18-2(a)(2) (West 2014)) and aggravated robbery (*id.* § 18-1(b)(1)). The armed robbery charge alleged that defendant took money from a gas station while armed with a firearm and threatened the employee with the use of force. The aggravated robbery charge alleged that during the robbery, defendant threatened the gas station employee with harm by indicating that he had a weapon.

¶ 5        Prior to trial, defendant filed a "Motion to Quash Arrest" and an "Amended Motion to Quash Arrest." In the amended motion, defendant argued that officers arrested him without a warrant or probable cause in violation of the Illinois and United States Constitutions. As relief, defendant requested that the court: "a. Quash his arrest, b. Immediately release him from custody, c. Any and all other relief the Court deems just and equitable under the circumstances."

¶ 6        On March 17, 2016, the State orally moved to strike defendant's motion. The State argued that there was no relief that the court could grant because quashing the arrest is not a statutorily

available remedy. Defense counsel argued that the search warrant was obtained due to an illegal arrest which required quashing the arrest. The court granted the State's motion to strike, stating that it was not allowed by law to grant defendant's motion.

¶ 7        During *voir dire*, a prospective juror indicated that she had an issue that might prevent her from serving on the jury. She indicated that she would be more comfortable discussing that issue in the court's chambers than in open court. The court invited the juror, defense counsel, and the prosecutor into chambers to discuss the issue. Defendant was not present during the in-chambers discussion.

¶ 8        In chambers, the prospective juror explained that she had medical appointments scheduled later in the week and early the next week and that she was concerned about the trial interfering with those appointments. The State requested that she be removed for cause. The court denied the State's request, and the State indicated that it would exercise a peremptory challenge to remove her from the jury.

¶ 9        In open court, the court excused the prospective juror. Defendant subsequently raised a *Batson* challenge. The court explained that the basis for the challenge was that both defendant and the prospective juror were black. The court also noted that one black person had already been seated on the jury, while another remained a potential juror. The court then explained the procedure to be followed:

> "The party making the *Batson* claim must establish a *prima facie* case of purposeful discrimination. Evidence must be produced sufficient to permit the trial judge to draw an inference that discrimination has occurred. Then the burden would shift to the other party to articulate a race-neutral reason, and I will weigh the evidence and make a decision."

¶ 10    Defense counsel's only argument was to state: "[A]s the Court identified on the record, the ethnicity of both the defendant as well as the perspective [*sic*] juror. I would submit that it is being used as a basis to affect the ability to empanel the jury based on race."

¶ 11    The court asked the State if it had anything to add in light of defense counsel's argument. The State asserted that *prima facie* evidence required a pattern of race-based strikes. The State pointed out that there had been no such pattern. The State concluded: "[T]he defendant has not met his burden initially, and we would ask the Court to rule accordingly."

¶ 12    The court found: "that defense [*sic*] has not established a *prima facie* case of purposeful discrimination." The court stated further that it was clear the State removed the prospective juror because of her medical appointments.

¶ 13    At trial, Aaron Ferguson testified that he was working as a clerk at a gas station on West Forrest Hill Avenue in Peoria on the morning of March 10, 2015. At approximately 8 a.m., an individual carrying a black gun entered the gas station demanding money. Ferguson described the person as wearing a white track jacket with the hood pulled up and a mask. The person struck Ferguson multiple times in the head with the gun.

¶ 14    Surveillance video from the gas station shown at trial depicted a black male wearing a white, zippered jacket with gray panels on the sides. The man wore a white hood. He appeared to be wearing a black stocking cap underneath the hood with a mask covering the lower half of his face. The man wore black gloves and held what appeared to be a black handgun. He carried a black, satchel-type bag that he placed on the counter. The man kept the gun pointed at Ferguson through most of the incident. A struggle between the two men ensued, and Ferguson received multiple blows on the head with the gun. Exterior footage from after the altercation showed the man heading toward Forrest Hill Avenue, then turning in the direction of Wilson Drive.

¶ 15        Earl Hensley testified that he was doing a home repair job one block from the gas station on March 10, 2015. He was sitting in his van waiting for his coworkers to arrive when he noticed a white Cadillac parked on the side of the road. The Cadillac was running, but no one was inside. Hensley testified that he saw a man running from the direction of Forrest Hill Avenue turn on Wilson Drive, run past Hensley's van, and enter the white Cadillac. The man then drove away. Hensley testified that the man was wearing a hooded jacket and a stocking cap.

¶ 16        Detective Craig Williams testified that he responded to the robbery call and received a description of the white Cadillac. Williams believed he was familiar with the vehicle in question and, along with Detective Richard Linthicum, was able to locate the white Cadillac parked in an alley behind a house on New York Avenue. As Williams and Linthicum surveilled the car, a man exited the house, removed something black from the white Cadillac, and began walking to the garage. The man then returned to the house. Williams identified defendant as the man he saw.

¶ 17        Williams testified that he informed Detective Steven Garner that he had located the white Cadillac. Hensley rode to the location with Garner to determine if he could make an identification. When they reached their destination, Hensley was able to identify the white Cadillac he had observed earlier. Garner pulled his vehicle into an alley, at which point the man came outside and walked by the vehicle. Hensley identified the man as the one who had run past his van earlier. In court, Hensley identified that man as defendant.

¶ 18        When Garner approached defendant, defendant ran, but was apprehended by Linthicum after a brief chase. Linthicum testified that while he and Williams were watching the white Cadillac, defendant retrieved a black bag from the car and then entered the garage.

¶ 19        Officer Brian Terry testified that he secured the residence on New York Avenue while a search warrant was obtained. After the court issued the search warrant, Terry participated in the

search of the house. Terry spoke to Angel Patterson, who directed him to the bottom drawer of her dresser, where Terry found a black handgun. Terry described the gun as belonging to Patterson. Terry then searched the garage, where he found what appeared to be a second firearm. Photographs admitted of the weapon found in the garage show it to be black with exposed silver or gray portions on top where the slide is missing. The handle was wrapped in black tape with a spring coiled loosely around the top front portion of the weapon.

¶ 20 On cross-examination, Terry confirmed that the weapon found in the garage turned out to be a broken BB gun. Terry agreed that the BB gun was completely black. Terry agreed that the gun found in Patterson's dresser was in a box underneath some folded clothes.

¶ 21 Paul Tuttle testified that, in addition to the gun, the crime scene unit found a white hooded sweatshirt and a black ski mask in the house. Photographs showed the ski mask had a zippered portion that would cover the chin, mouth, and lower portion of the nose. Tuttle swabbed the gun for potential DNA because he knew Ferguson had been struck with a gun at the gas station. No DNA testing was ever requested on the swabs taken.

¶ 22 Patterson testified that she owned the black firearm found at the house. The gun was in the same location—under folded clothes in her bottom dresser drawer—as the last time she saw it. She testified that no one else in the house knew about the gun or where it was kept.

¶ 23 Alesha List, a secretary from defense counsel's office, made still photographs from the surveillance video. She testified that one photograph appeared to show a gun in the robber's hand. When defense counsel asked List whether parts of the gun were different colors, List responded affirmatively, stating that there was a silver or gray part to the gun, which was otherwise completely black.

6

¶ 24    In its closing argument, the State repeatedly asserted that defendant had a gun or firearm during the robbery. In reciting the propositions with respect to armed robbery, the State argued that defendant carried a firearm during the robbery. After summarizing the propositions with respect to aggravated robbery, the prosecutor declared: "Now, you have two guns that were located. You have a gun, a firearm, and you have a BB gun. And I would submit to you that the aggravated robbery goes towards that BB gun."

¶ 25    In defense counsel's closing, he argued, in part, that no DNA was found in the case. Counsel criticized the investigators for failing to conduct tests for DNA.

¶ 26    During deliberations, the jury sent a question to the court, asking: "Why wasn't anything tested for DNA?" The court responded only by telling the jury it was to consider the evidence before it.

¶ 27    After the jury began its second day of deliberations, defendant inquired why the DNA was not tested and asked why the court could not order DNA testing. The court responded that it would not suspend deliberations and reopen proofs. The court asked why a request to test the DNA was not made weeks or months earlier. Defense counsel replied that Tuttle's testimony had come as a surprise, as discovery had not revealed that a DNA swab had been taken from the gun. The State stated that discovery did show a swab was taken from the gun but there was no indication that any biological material was present on the gun. Defense counsel subsequently withdrew his request.

¶ 28    The jury found defendant guilty on both counts. In the four months between the return of the verdict and sentencing, defendant sent three letters to the court, requesting that the swabs from the gun be tested for DNA. At sentencing, defendant continued to profess his innocence and asked the court to have the swabs tested. The court found it was not required to respond to that request. As to the sentence, the court merged the armed robbery and aggravated robbery counts and

7

imposed a sentence of 33 years' imprisonment for armed robbery. That sentence included a 15-year mandatory firearm enhancement.

¶ 29    On appeal, defendant argued, *inter alia*, that trial counsel was ineffective for failing to test the DNA swabs taken from the gun found at the residence. We vacated defendant's conviction and remanded for a new trial. *Johnson*, 2020 IL App (3d) 160675, ¶ 47. Subsequently, our supreme court reversed our judgment and remanded the case back to this court to decide the remaining issues. *Johnson*, 2021 IL 126291, ¶ 60.

¶ 30                                   II. ANALYSIS

¶ 31                                 A. Guilty Verdicts

¶ 32    Defendant argues that his convictions must be reversed, and the case remanded for a new trial due to inconsistent verdicts. Defendant contends that the guilty verdicts for both armed robbery and aggravated robbery are legally inconsistent because the State was proceeding under armed robbery in relation to the handgun, and aggravated robbery under the theory defendant used a BB gun during the robbery.

¶ 33    The determination of whether verdicts are legally inconsistent is a question of law that is subject to a *de novo* review. *People v. Price*, 221 Ill. 2d 182, 189 (2006). " 'Legally inconsistent verdicts occur when an essential element of each crime must, by the very nature of the verdicts, have been found to exist and to not exist even though the offenses arise out of the same set of facts.' " *Id.* at 188 (quoting *People v. Frieberg*, 147 Ill. 2d 326, 343 (1992)).

¶ 34    Defendant was charged and convicted of armed robbery and aggravated robbery. To prove armed robbery, the State must show that defendant took property from Ferguson using force or threatened force while armed with a firearm. 720 ILCS 5/18-2(a)(2) (West 2014). To prove aggravated robbery, the State must prove that defendant took property from Ferguson using force

8

or threatening the use of force while indicating he was armed with a firearm or weapon. *Id.* § 18-1(b)(1). Even though the State argued in its closing argument that the aggravated robbery charge was intended for if the jury believed defendant carried a BB gun instead of a firearm during the robbery and armed robbery if it believed he had a firearm, it is not legally inconsistent to find defendant guilty of both charges. The statutes do not make the same distinction the State argued to the jury. Guilty verdicts for armed robbery and aggravated robbery are plainly not inconsistent. There is no element here that must exist under one charge but must not exist under the other. A person carrying a gun during a robbery can also indicate by his words or actions that he is armed, thus satisfying both statutes.

¶ 35                             B. Request for DNA Testing

¶ 36        Defendant argues that the circuit court erred in denying his requests to order DNA testing on the handgun swabs.

¶ 37        Section 116-3 of the Code of Criminal Procedure of 1963 (Code) allows a defendant to make a motion to the court after "judgment of conviction" for DNA testing on evidence relating to the conviction which had not been subjected to testing before trial. 725 ILCS 5/116-3(a)(1) (West 2014). The request for DNA testing must be directed at "the trial court that entered the judgment of conviction in [defendant's] case." *Id.*

¶ 38        The issue here is timing. Defendant included his request for DNA testing in his posttrial motions before the circuit court sentenced him. Defendant contends that the statute does not require the request to be made after sentencing, and that "judgment of conviction" includes the time where posttrial motions are made before sentencing. However, section 102-14 of the Code defines judgment as "an adjudication by the court that the defendant is guilty or not guilty and if the adjudication is that the defendant is guilty it includes the sentence pronounced by the court." *Id.*

9

§ 102-14. Therefore, defendant cannot make a motion for DNA testing until after sentencing, as the judgment of conviction does not occur until a sentence has been imposed. Defendant made his request prior to sentencing and did not raise it again after sentencing. The court therefore did not err by not ordering the DNA testing.

¶ 39    There is no time limitation for when defendant must make this request, however. See *People v. Henderson*, 343 Ill. App. 3d 1108, 1115 (2003). Our finding does not preclude defendant from requesting DNA testing in a postconviction proceeding, provided he can meet the requirements of the statute.

¶ 40                    C. Motion to Quash Arrest

¶ 41    Defendant contends that his arrest was illegal because he was arrested without probable cause. He further argues that the court erroneously granted the State's motion to strike his motion to quash because the evidence recovered due to his arrest could have been suppressed. Thus, defendant argues this court should remand so defendant's motion to quash arrest may be heard.

¶ 42    A motion to quash arrest is a motion that is not explicitly recognized in the Code. See *People v. Ramirez*, 2013 IL App (4th) 121153, ¶ 56. Case law suggests that a motion to quash should be treated the same as a motion to suppress evidence. See *People v. Hansen*, 2012 IL App (4th) 110603, ¶¶ 62-63.

¶ 43    Section 114-12 of the Code, titled "Motion to Suppress Evidence Illegally Seized," provides that a defendant may move the court for the return of property and suppression of evidence that was unlawfully seized. 725 ILCS 5/114-12(a) (West 2014). At a minimum, a motion to suppress filed under section 114-12 of the Code must clearly state the "facts showing wherein the search and seizure were unlawful." *Id.* § 114-12(b).

¶ 44 It is not unusual for a motion to be styled as a "motion to quash the arrest and suppress evidence" or something similar. In these instances, the motion to suppress is the pertinent motion to be considered. Even if a court were to find a defendant's arrest invalid, the remedy available is not dismissal of the charges or to otherwise release a defendant from custody. *People v. Williams*, 2019 IL App (3d) 160132, ¶ 13. The appropriate remedy would be to suppress the evidence obtained because of the arrest. *Id.* Further, even where a motion is only labeled as a "motion to quash arrest," courts should apply the well-settled doctrine that "it is a motion's substance, not its title, that controls its identity." *People v. Helgesen*, 347 Ill. App. 3d 672, 677 (2004). When a motion to quash arrest identifies specific evidence seized, states facts showing said seizure to be unlawful, and requests suppression of that evidence, it is in substance a motion to suppress and should be evaluated as such. *Id.*

¶ 45 Defendant argues that his "Amended Motion to Quash Arrest" operates as a motion to suppress because the police obtained a warrant to search his home based on his arrest. He contends that the motion sought to suppress evidence seized from the search warrant. However, defendant's motion is not a motion to suppress evidence under section 114-12 of the Code. Defendant's motion does not ask the court to suppress any evidence, defendant never requested the suppression of evidence during the hearing on the motion, and defendant did not identify the evidence sought to be suppressed. Further, while the evidence in question was seized pursuant to a search warrant, defendant never argues how that warrant was deficient. In fact, he never mentions the warrant. The only relief requested by defendant was the quashing of his arrest and his immediate release from custody. Any argument that the motion to quash should serve as a motion to suppress evidence that should have been heard by the court therefore fails. See *Ramirez*, 2013 IL App (4th) 121153, ¶¶ 63-65.

11

¶ 46                                            D. Right to Be Present

¶ 47       Defendant argues for reversal of his convictions and remand for a new trial because during *voir dire* a prospective juror was brought into the judge's chambers for further questioning and defendant was not present. Defendant argues that his absence deprived him of his right to be present during the entire jury selection process, a right secured by the Illinois and United States Constitutions. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 8.

¶ 48       We review this issue under the plain error doctrine as defendant failed to preserve the issue for appellate review. *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). Under the plain error doctrine, we may review an unpreserved error when the evidence is either closely balanced or the error is so serious as to necessitate reversal. *Id.* The first step in either analysis is to determine whether there is an error. *Id.*

¶ 49       A defendant has a general right to be present at every stage of his trial, including jury selection. *People v. Smith*, 6 Ill. 2d 414, 416 (1955). However, this right does not encompass every second of the process. *People v. Bean*, 137 Ill. 2d 65, 84 (1990). The right is only violated when defendant's absence results in a denial of a fair trial. *Id.* That is, it caused defendant to be tried and convicted by a jury prejudiced against him. *People v. Starks*, 287 Ill. App. 3d 1035, 1040 (1997).

¶ 50       Here, defendant was excluded from the questioning of one prospective juror in the judge's chambers regarding why she had a potential conflict if the trial continued into the next week. The State ultimately exercised a peremptory challenge to excuse the juror. Although defendant should have been present during questioning, he has not proven that this one bout of questioning resulted in him receiving a prejudiced jury. Notably, defendant was present for the questioning that occurred before the juror asked to speak with the court in chambers and defense counsel was present during the in-chambers discussion. Although defendant's broad right of presence was

12

denied and could have affected the impartiality of the jury, defendant's absence did not, in fact, have the slightest effect on the impartiality of the jury selected. Indeed, defendant does not claim his jury was not impartial; his argument is solely based on the broad right of presence. Thus, because defendant does not challenge the impartiality of the 12 jurors who convicted him, the possibility that this one venire member would have become a juror is of no consequence. Therefore, no error occurred. See *id.* at 1041.

¶ 51                                    E. *Batson* Challenge

¶ 52          Defendant contends the circuit court improperly handled his *Batson* challenge.

¶ 53          *Batson v. Kentucky*, 476 U.S. 79, 96 (1986) created a three-step process for evaluating whether the use of a peremptory challenge was based on race. First, defendant must establish a *prima facie* case that the State exercised its challenges based on race. *Id.* at 93-94. In the second step, the burden shifts to the State to provide a race-neutral basis for its strike. *Id.* at 94. The third step requires the court to determine whether the defendant has shown that purposeful discrimination took place. *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008). The reviewing court will not reverse a circuit court's ruling on a *Batson* claim unless it was clearly erroneous. *People v. Bradshaw*, 2020 IL App (3d) 180027, ¶ 37.

¶ 54          Defendant argues we should remand the cause for a *Batson* hearing because the circuit court improperly collapsed the three-step *Batson* approach. Defendant claims that the procedure was not properly followed because the court asked for the State's position during the first step. We find that the court properly outlined the correct *Batson* procedure, making clear at the outset that its initial inquiry would be limited to defendant's *prima facie* showing of race-based challenges. After allowing defense counsel to make his case, the court asked the State for its input. The court ultimately found that defendant did not make a *prima facie* case that the State exercised a

13

peremptory challenge based on race and did not proceed with the hearing. While the court allowed the State to comment, it ruled exclusively on the defendant's argument and concluded the *Batson* proceeding at the first step. In other words, defendant simply did not meet his burden of providing further evidence of discrimination to justify the court continuing to the second step of the *Batson* hearing.

¶ 55                                  III. CONCLUSION

¶ 56         The judgment of the circuit court of Peoria County is affirmed.

¶ 57         Affirmed.