2023 IL App (1st) 211030-U

No. 1-21-1030

Order filed July 24, 2023

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 91 CR 2778 |
| | ) | |
| BYRON PERKINS, | ) | Honorable |
| | ) | Thomas J. Hennelly, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Lavin and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court's order denying defendant's motion for forensic testing is affirmed where the requested testing would not produce evidence materially relevant to his claim of actual innocence.

¶ 2   Defendant Byron Perkins appeals the circuit court's denial of his motion for forensic testing

pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West

2014, 2018)).[1] On appeal, he argues his motion should have been granted because identity was the issue at trial, there was a sufficient chain of custody, and the requested testing has the potential to produce new, noncumulative evidence that would materially advance his claim of actual innocence. We affirm.

¶ 3      Defendant and codefendant Antjuan Jackson were charged together by a 31-count indictment with offenses arising from shootings in Chicago on December 15, 1990.[2] In 1994, a jury found defendant guilty of the first degree murder of Keith Adams, the attempted first degree murders of Jeffrey Wright and Donald Jones, and the armed robbery of Wright, Jones, and Adams. He was sentenced to natural life in prison for first degree murder and 30 years each for the attempted first degree murder and armed robbery counts, to be served consecutively. We affirmed on direct appeal. *People v. Perkins*, No. 1-95-0648 (1997) (unpublished order under Illinois Supreme Court Rule 23).

¶ 4      At trial, Wright testified that "off and on" over the last 10 years, he and Jones used stolen credit cards to purchase items, which they stored in their apartment in the 1500 block of West Greenleaf Avenue. On December 15, 1990, their apartment contained multiple television sets, VCRs, camcorders, stereo equipment, athletic wear, shoes, and clothing.

¶ 5      At about 4 p.m. that date, Wright, Jones, and Adams drove in Adams's vehicle, which was a Chevrolet Spectrum, to Wright's apartment. When they arrived, Wright saw defendant, identified in court, in the apartment building's stairwell. Wright knew defendant as Jones's friend and had

---

[1] While the majority of the record spells defendant's first name as "Byron," defendant spells his first name as "Bryon" in his *pro se* filings in the record. We adopt the spelling "Byron," as used in defendant's indictment, mittimus, and notice of appeal.

[2] The record reflects Jackson's first name as Antjuan and Untjuan. We adopt the name of Antjuan as reflected in his affidavit appearing in the record.

previously seen defendant at his apartment twice. Wright and Jones exited the vehicle, approached the stairwell, and went up to the apartment. They greeted defendant, who introduced Wright to defendant's cousin, codefendant Jackson. Wright, Jones, defendant, and Jackson went inside the apartment, and Adams later joined them. The group had a "basic conversation" for about 20 minutes, and then defendant and Jackson "exchanged *** whispers." Wright, Jones, and Adams decided to leave for the mall. Defendant and Jackson decided to go with them.

¶ 6     Wright walked toward the front door with Jones and Adams behind him, and defendant and Jackson behind them. When Wright reached for the doorknob, he heard defendant say, "[D]on't touch that motherf***ing doorknob; this is a stick-up." Wright turned around and "looked down the barrel of a shotgun" that Jackson held from about three to four feet away. Defendant pointed a silver pistol at Wright, Jones, and Adams and ordered them to the ground, facedown. Defendant then instructed Jackson "to get the tape" and "bond these motherf***ers, gag these motherf***ers." Using packaging tape, Jackson taped Wright, Jones, and Adams across their mouths, taped their arms behind their back, and bound their feet. Defendant then instructed Jackson to "go through the house," get items, and "load*** them up." Jackson "ransack[ed]" Jones's bedroom and brought bags from the bedroom to the doorway, while defendant paced in front of Wright, Jones, and Adams. Eventually, Jackson stood over them with the firearm while defendant went to the bedroom and found more items. Jackson then went through their pockets under defendant's direction. Jackson took from Wright's pockets a wallet containing Wright's identification, credit card, about $20 in cash, and a set of keys. He took from Adams's pockets a wallet and keys. Jackson made about seven trips taking items from the apartment to Adams's vehicle and then reported there was no more room in the vehicle.

¶ 7      Defendant told Jackson to turn up a radio's volume and retrieve pillows for Wright, Jones, and Adams, because "it was time to do these motherf***ers." Jackson turned up the radio's volume. Defendant assisted Jackson in placing pillows over the heads of Wright, Jones, and Adams while they were still face-down on the floor. From behind them, defendant said, "[W]ell, this is it, guys, say good-bye." He fired shots in Wright's back and arm, then two shots at Adams, and then one shot at Jones. As defendant and Jackson left, defendant said, "[T]his motherf***er ain't dead." He returned to Wright and placed the firearm against the pillow on Wright's head. Wright heard defendant's firearm made a clicking sound, but no bullets discharged. Defendant and Jackson immediately left the apartment. Wright and Jones survived their shots, but Adams was not moving. Wright saw the apartment was missing all of the clothing, shoes, jewelry, money, luggage, garment bags, and televisions except for one.

¶ 8      Jones called the police, who arrived minutes later. Wright named defendant as one of the offenders to the police. He later identified Jackson from a lineup at the police station.

¶ 9      On redirect examination, Wright testified that when the pillow was over his head and just before he was shot, he saw defendant's shoes. He also saw the shadow from the firearm. On recross-examination, he confirmed that he saw the firearm's shadow about 1½ feet from the floor, and saw defendant with Adams. He also stated that he saw Jackson's feet next to defendant's feet.

¶ 10      Jones testified similarly to Wright regarding the events of December 15, 1990. He added that he was friends with defendant and had known him for three years. Defendant called him that morning to say he was coming over to bring some money that he owed. Later in the day, he saw defendant at his apartment. When Jones was on the floor, someone took about $40 or $50 from his pockets. From the corner of his eye, Jones saw defendant shoot Wright. He saw defendant walk

by Adams's head and shoot him. Defendant then shot Jones in his right upper back. Jones told the responding police that defendant shot him and identified Jackson by his nickname, "Hooker," as defendant's cousin. Jones later identified Jackson from a lineup.

¶ 11    John Hayes testified that on December 20, 1990, he allowed Jackson to stay with him for several days. They drove to a house on Washington Boulevard and Central Avenue, and Jackson entered the house while Hayes remained in the vehicle. Jackson and defendant, identified in court, exited the house each carrying a bag. Jackson introduced defendant as his cousin. Defendant, Jackson, and Hayes then went to Hayes's apartment. Defendant and Jackson carried bags into the apartment containing various items, including clothing, cologne, shoes, and hats.

¶ 12    On a later date, at the apartment, defendant told Hayes that he and Jackson "shot these three guys up over on Greenleaf Street." Defendant stated he had a .22-caliber firearm and Jackson had a shotgun during the incident. Defendant recounted that he and Jackson told the three men to lay down, tied up and gagged them, put pillows over their heads, turned the music up "real loud," "got all of their stuff together," shot them, and left. Defendant also recounted that he told Jackson to throw the guns in the river. On January 3, 1991, Hayes returned to his apartment to find detectives waiting for him. Hayes relayed to the detectives what defendant had told him, and they gathered Jackson's and defendant's bags.

¶ 13    On cross-examination, Hayes testified that both defendant and Jackson stayed at his apartment for almost two weeks.

¶ 14    Chicago police officer Donald Rose testified that he and his partner Officer Chow responded to the scene of the shooting on December 15, 1990, at about 5 p.m.[3] Rose observed a

---

[3] The first name of Officer Chow does not appear in the transcript of the trial proceedings.

large puddle of blood in the middle of the living room floor and three pillows on the floor, at least one with bloodstains on it and another with gunpowder burns. Wright identified and described both defendant and Jackson as the offenders. He also told Rose that defendant and Jackson stole several television sets, a VCR, and a Chevrolet Spectrum belonging to one of the victims.

¶ 15    On cross-examination, Rose testified that Wright only gave defendant's race, sex, age, and name, but no physical description of defendant. On redirect examination, after viewing the case report he wrote, Rose testified that he received information that the shooter was "a male black, approximately 22 years old, 5 foot 6, 120 pounds."

¶ 16    Chicago police mobile crime lab technician John Naujokas testified that he processed the scene, which included examining and photographing evidence. A photograph, marked as exhibit 8, depicted a multicolored pillowcase with burn marks on the top portion of the pillow, which is generally indicative of gunfire. A photograph, marked exhibit 10, depicted a white pillow that had a blood spatter. The pillow and pillowcases were not suitable for lifting fingerprints. The State presented Naujokas with three exhibits, marked as group 6. Those three exhibits were a multicolored pillow with a burn mark and blood stains on it, a multicolored pillow that was "stained and soiled" and submitted to trace serology for further analysis, and a white pillowcase with a blood spatter on it that was also submitted to serology. A clear adhesive tape was also recovered from the scene and tested for fingerprints. Naujokas testified that no cartridge cases or fired bullets were found at the scene, which was expected because a revolver does not eject cartridge cases "in an automatic fashion."

¶ 17    Naujokas lifted prints from a Sony Watchman television and Sony clock radio in the living room, and a cup and wine glass from the kitchen. Two bags and some clothing at the scene were

not suitable for fingerprint lifts because they were likely to absorb body moisture. Naujokas was unable to recover any other lifts from the scene.

¶ 18    Chicago police detective Tony Villardita also testified that he responded to the scene. He observed a pool of blood in the center of the living room, and blood drops leading to the bedroom and kitchen. In the bedroom, "everything was upside down," and articles of clothing with price tags still on them were on the floor "like somebody had ransacked it."

¶ 19    At the police station, Villardita spoke with Jones and learned that the offenders' names were "Byron Perkins" and "Untjuan," also known as "Hooker." Jones had known defendant for at least two years. Villardita also learned that the offenders took Adams's vehicle, and he then radioed a message to hold the vehicle if it was seen.

¶ 20    Chicago police officer Kevin Navarro testified that on January 3, 1991, at about 11 a.m., he was driving around the 4700 block of West Huron Street when he saw a 1988 Chevrolet Spectrum with no front plate. Navarro attempted to curb the Spectrum but the vehicle drove away, so he chased it for about six or seven blocks. A check of the vehicle's rear license plate "c[ame] up as taken in a homicide." The driver of the Spectrum attempted to flee on foot, while two other occupants in the Spectrum did not flee. Navarro caught up to the driver on foot, arrested him, and learned he was Jackson.

¶ 21    Chicago police detective John Fitzsimmons testified that he spoke with Jackson at the police station after Jackson's arrest. Jackson agreed to accompany him in looking for defendant, eventually leading to Hayes's apartment, but defendant was not present. Hayes provided his consent to the officer to conduct a search of the apartment. Fitzsimmons recovered gym bags from the apartment.

¶ 22   A Cook County assistant chief medical examiner testified that she performed an autopsy on Adams, who had two gunshot wounds in his back, and a bullet lodged in both his spine and anterior chest wall. The examiner opined that Adams died from multiple gunshot wounds.

¶ 23   The State rested. Defense counsel then informed the court that defendant wanted to call Jackson, who had signed an affidavit saying he was responsible for "this entire thing." After the court spoke with Jackson's counsel, defendant called Jackson, who invoked his Fifth Amendment privilege and did not testify.

¶ 24   During closing arguments, defendant argued, in relevant part, that the only information the officers had to "go on" was from Wright and Jones, who were the only individuals stating defendant robbed the apartment, and no fingerprints were recovered that could be used to incriminate him. In rebuttal, the State argued that defendant knew the victims, had been in the apartment previously, and knew the stolen items were inside the apartment.

¶ 25   The jury found defendant guilty of the first degree murder of Adams, the attempted first degree murders of Wright and Jones, and the armed robbery of Wright, Jones, and Adams. The trial court sentenced defendant to natural life in prison for first degree murder and 30 years each for the attempted first degree murder and armed robbery counts, to be served consecutively.

¶ 26   We affirmed on direct appeal. *People v. Perkins*, No. 1-95-0648 (1997) (unpublished order under Illinois Supreme Court Rule 23).

¶ 27   On August 22, 2014, defendant filed a *pro se* section 116-3 motion for forensic testing, alleging the police took his fingerprints but "no other biological evidence" despite "the fact that multiple items of (DNA Bearing Evidence) had been collected from the crime scene." He claimed the fingerprint expert could not determine that the fingerprints found at the scene belonged to

defendant. He also claimed that untested blood and saliva samples, an untested firearm, and the vehicle with three occupants, none of whom were defendant, were all "proof" that identity was an issue at trial. Defendant requested that the court order the State to "produce (all Items of DNA-Bearing Evidence), and any items that could bear DNA evidence for the defense to inspect." He asserted that the actual testing of the items had the potential to produce new, noncumulative evidence materially relevant to his assertion of actual innocence.

¶ 28 Defendant attached to the motion the police report of Jackson's arrest.

¶ 29 He also attached Jackson's affidavit dated August 22, 1996. Jackson averred that he took "full blame [for] the crime [defendant] has been arrested for" and defendant did not "have anything to do with the case." Jackson "was a user of drugs, smoking cocaine that led [him] to do things [he] regret[s]." On December 15, 1990, he was "high" and went to the 1500 block of West Green Leaf without defendant to rob Jones. Jackson averred that he shot all three victims. He told the victims "I'm glad [defendant] set [this] up," as his "whole plot" was to have the victims identify defendant. After the robbery, Jackson asked to stay at Hayes's home and brought travel bags with the property he took from Jones's apartment. On January 3, 1991, he was caught driving Adams's vehicle. He lied to the police that defendant left bags at Hayes's house and was hiding there. However, Jackson had taken the two travel bags of items from Jones's apartment and left them at Hayes's house.

¶ 30 Jackson further averred that he "manipulated" defendant to not notice that Jackson framed him. Jackson's public defender later informed him of an offer by the State, in which Jackson would receive a "lesser sentence" if he said defendant "did the crime." Jackson rejected the offer, but his public defender told him if he stated what he presented on his affidavit, Jackson would receive the

death penalty. Jackson averred he had attempted to present an affidavit twice to "clear" defendant's name, but his public defender and the assistant state's attorney "destroyed" both affidavits. He averred that his public defender and the State "did all they could do to block the truth not to be told by using the death penalty to direct [Jackson] to not voice what happened in this case."

¶ 31 Defendant was appointed counsel, and his initial motion was continued from 2014 through 2019.

¶ 32 On January 23, 2019, defendant filed a second *pro se* section 116-3 motion for forensic testing. He asserted that during his trial, a lab technician testified that he collected fingerprints from different items from the crime scene but did not know whether the fingerprints matched those of defendant. Defendant claimed that it was hidden from the jury that his fingerprints and blood were not found at the scene and in Adams's vehicle. He requested the court "have them go to the [Chicago] police forensic unit to get the evidence [they hid] from my jury in trial." He claimed that there was a "conspiracy to prove [his] wrongful conviction," and lab reports showed the "fingerprints and blood" were not his.

¶ 33 On February 14, 2019, defendant also filed a *pro se* "motion for exigent circumstances," requesting "documents" of "(fluids)" that were "withheld from [his] jury trial," as well as fingerprints from a "latent print card," which were not a match with his. He asserted the lab testing of the blood and fingerprints, along with Jackson's affidavit, would prove his innocence.

¶ 34 On July 20, 2020, the State filed a motion to dismiss defendant's section 116-3 motions. The State argued that it presented significant evidence of defendant's guilt at trial, which included the identification of defendant by the two surviving victims. The State also asserted that the results from the testing would have little probative value because there was no evidence that defendant

touched the items or bled in the apartment, and it was unknown how many other individuals may have used the vehicle before it was recovered. Additionally, the State asserted that no firearm was recovered for testing. The State argued that the evidence used as exhibits at trial would not be reliable because they may have been touched by attorneys, witnesses, the courtroom deputy, and jurors. Moreover, the State argued that defendant had failed to show the pillows and pillowcases were subject to a chain of custody sufficient to establish they had not been contaminated.

¶ 35    That same date, defendant's counsel told the court he would not be supplementing defendant's most recent *pro se* motion for forensic testing but adopted defendant's prior motion containing the affidavit and police report.

¶ 36    On December 11, 2020, the court heard arguments on the motions.

¶ 37    Defendant's counsel argued there were "possible biological materials" in the form of DNA from a television, clock radio, glass, vehicle, "another unidentified item," and blood samples from the scene. He asserted there was also tape found at the scene potentially containing DNA material, and possible saliva samples from a glass "along with other items of latent prints" and "unidentified latent prints." Counsel noted Jackson's affidavit and argued that testing the items "may go towards" defendant's actual innocence claim.

¶ 38    The State responded that Jackson's affidavit stating that he alone committed the crimes would not render any additional forensic testing material, and the evidence did not reflect that defendant touched the items sought to be tested. The State further argued that it was concerned about contamination of the tape used to bound the victims as it had already been tested for fingerprints.

¶ 39    On August 11, 2021, the trial court denied defendant's motions. The court stated there was nothing in the *pro se* pleadings indicating the items in question, "the cups, the sink, the TV, the clock, the radio, any of those things" were not tested, or that any of them "would have established some sort of actual innocence or benefit to the defendant." The court also noted there was an "issue of contamination" as the State noted in its argument. The court gave "very little weight" to Jackson's affidavit, as "an eleventh hour sole admission to responsibility by a co-defendant should be viewed with great suspicion."

¶ 40    On appeal, defendant argues that the trial court erred in denying his motions for forensic testing because identity was the issue at trial, a sufficient chain of custody existed, and the requested testing had the potential to produce new, noncumulative evidence materially relevant to his claim of actual innocence.

¶ 41    Postconviction access to forensic testing is not a constitutional right but a statutory right governed by state legislatures. *People v. Grant*, 2022 IL 126824, ¶ 26 (citing *District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52, 72-74 (2009)). In Illinois, the legislature enacted section 116-3 to "provide an avenue for convicted defendants who maintained their innocence to test available genetic material capable of providing new and dramatic evidence materially relevant to the question of the defendant's actual innocence." *People v. Henderson*, 343 Ill. App. 3d 1108, 1114 (2003). Under section 116-3, a defendant may move "for the performance of fingerprint, Integrated Ballistic Identification System, or forensic DNA testing *** on evidence that was secured in relation to the trial *** which resulted in the defendant's conviction," and either (1) "was not subject to the testing which is now requested at the time of trial" or (2) "although previously subjected to testing, can be subjected to additional testing utilizing a method that was

not scientifically available at the time of trial that provides a reasonable likelihood of more probative results." 725 ILCS 5/116-3(a) (West 2014, 2018).

¶ 42　The defendant must present a *prima facie* case that: "(1) identity was the issue in the trial or guilty plea which resulted in his or her conviction"; and "(2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect." 725 ILCS 5/116-3(b) (West 2014, 2018). If the defendant establishes a *prima facie* case, then the trial court must allow testing under reasonable conditions upon a determination that:

> "(1) the result of the testing has the scientific potential to produce new, noncumulative evidence (i) materially relevant to the defendant's assertion of actual innocence when the defendant's conviction was the result of a trial, even though the results may not completely exonerate the defendant, *** and

> (2) the testing requested employs a scientific method generally accepted within the relevant scientific community." 725 ILCS 5/116-3(c) (West 2014, 2018).

¶ 43　The State agrees defendant established his *prima facie* case but disputes his contention that the testing would have the potential to produce new, noncumulative evidence materially relevant to defendant's assertion of actual innocence.

¶ 44　"A materially relevant determination requires an examination of the trial evidence, as well as the evidence the defendant wants to test." *People v. Navarro*, 2015 IL App (1st) 131550, ¶ 13. The phrase "materially relevant" has been interpreted to include evidence that will "significantly advance defendant's claim," and the evidence "need not exonerate defendant by itself." (Internal quotation marks omitted.) *People v. Shum*, 207 Ill. 2d 47, 66 (2003). "DNA evidence that plays a

minor role and is a collateral issue is not materially relevant because it does not significantly advance a claim of actual innocence." *People v. Gecht*, 386 Ill. App. 3d 578, 582 (2008).

¶ 45 Because a section 116-3 motion is a pleading in the nature of a civil complaint or petition for relief, "we must accept as true and construe liberally the well-pleaded facts in the petition unless contradicted by the record." *People v. Cocroft*, 2020 IL App (1st) 180056, ¶ 21. A ruling on a motion for postconviction testing under section 116-3 is reviewed *de novo*. *People v. Stoecker*, 2014 IL 115756, ¶ 21.

¶ 46 We find that the trial court properly denied defendant's requested forensic testing as the results of that testing would not be materially relevant to the defendant's assertion of actual innocence. At trial, the State presented two surviving witnesses, Wright and Jones, who testified that, on December 15, 1990, they spoke with Adams, defendant, and Jackson in Jones's apartment for about 20 minutes before defendant pulled a firearm on them, ordered Jackson to bind Wright, Jones, and Adams, ordered Jackson to remove property from the apartment, and then shot each of the victims while they were bound on the floor with pillows over their heads.

¶ 47 Wright and Jones knew defendant prior to that day and both identified defendant as the shooter to police officers. Hayes testified that defendant and Jackson stayed at his home soon after the crime, and defendant admitted to the crime, which defendant described to Hayes in detail. Thus, the evidence at trial, including his admission to Hayes, overwhelmingly established defendant committed the offenses. See *People v. Navarro*, 2015 IL App (1st) 131550, ¶ 16 (testing of ballistic evidence would be immaterial where the State called multiple eyewitnesses who identified the defendant as the shooter).

¶ 48      Defendant claims that the forensic testing requested in his section 116-3 motion would show he was not present at the scene of the crime, and only his codefendant, Jackson, committed the crimes. As support, he provided Jackson's affidavit, which averred that Jackson essentially framed defendant for the crime, even though defendant was not present at the scene and had nothing to do with the crime.

¶ 49      However, at no point did the State's witnesses testify that defendant touched the items he requested to be tested, including the glasses, television, clock radio, and tape inside the apartment. There was also no testimony that defendant bled at the scene. Thus, any test results showing that defendant did not contribute any DNA or fingerprints to the items in Jones's apartment or the blood sample recovered from the scene would not undermine the State's trial evidence.[4] See *People v. English*, 2013 IL App (4th) 120044, ¶¶ 23-24 (forensic testing would not significantly advance a claim of actual innocence where, even if testing the firearm at issue revealed fingerprints of another party and not the defendant, it would not undermine any of the evidence and would have "little to no impact on [the] defendant's case," as the evidence showed defendant's accomplice possessed the firearm). Therefore, any evidence acquired from testing the requested items would not be materially relevant to the issue of whether defendant was present at the scene and would not lend support to Jackson's affidavit that he acted alone in committing the offenses.

---

[4] We note that, while the parties on appeal discuss whether forensic testing of the pillows and pillowcases at the scene would have produced materially relevant evidence, defendant never specifically raised this evidence in its section 116-3 motions or at the hearing on the motion, much less identified the testing they should receive or what the testing of the items would uncover, as required by section 116-3. See *People v. Gibson*, 357 Ill. App. 3d 480, 488 (2005) (limiting the reviewing court's analysis to the testing of evidence specifically requested in the defendant's section 116-3 motion, corresponding memorandum, and testimony at the motion hearing).

Any results gained from the requested forensic testing of that evidence in question would not be materially relevant to his claim of innocence.

¶ 50 In a similar vein, any potential DNA or fingerprint evidence recovered from Adams's vehicle also would not materially advance defendant's actual innocence claim. Adams's vehicle was not recovered until weeks after the incident. Jackson was found driving the vehicle with two passengers, none of whom were defendant. Given that multiple other people had used the vehicle and weeks had passed by the time the vehicle was recovered, evidence that defendant's DNA or fingerprints were not in the vehicle would not call into question whether defendant was present at the scene of the robberies and shootings. Thus, any further forensic testing of the vehicle would not produce evidence that would materially advance defendant's claim that he was innocent. See *English*, 2013 IL App (4th) 120044, ¶ 24 (fingerprint lift on firearm not materially relevant to question of whether the defendant used the firearm, where the firearm was recovered more than two weeks after the robbery, and evidence showed the firearm was used in three other robberies during that period of time); *Gecht*, 386 Ill. App. 3d at 582 (finding DNA testing of knives and carpeting implicated in a sexual assault would not have significantly advanced an actual innocence claim, where the knives and carpeting were implicated in several other attacks). Also, while defendant requested testing of a firearm, no firearm was recovered to permit testing of any kind.

¶ 51 We conclude that the requested testing was not materially relevant to defendant's actual innocence claim, and the circuit court was justified in denying defendant's section 116-3 motion.

¶ 52 For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 53 Affirmed.